UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

ARLEN FOSTER and CINDY FOSTER,

          Plaintiffs,

v.

THE UNITED STATES DEPARTMENT OF
AGRICULTURE; TOM VILSACK, in his
official capacity as Secretary of the United
States Department of Agriculture; THE
NATURAL RESOURCES CONSERVATION
SERVICE; TERRY COSBY, in his official
capacity as Acting Chief of the Natural
Resources Conservation Service; and LAURA
BROYLES, in her official capacity as Acting
South Dakota State Conservationist,

          Defendants.

Case No. ___21-4081_____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Introduction**

1. This case is about the federal government's demand that Plaintiffs Arlen
and Cindy Foster preserve a mud puddle in the middle of their farm field in a state
of muddiness prescribed by the Defendant federal agencies and officials. This
photograph, taken on March 25, 2021, depicts the mud puddle, looking from South to
North:



2.      In 2011, Defendants Natural Resources Conservation Service (NRCS) and United States Department of Agriculture (USDA) certified a determination under 16 U.S.C. § 3822 that the mud puddle is a federally regulated wetland ("2011 Certification"). As a consequence, in many years Plaintiffs are unable to drain the mud puddle and immediately surrounding area adequately to farm it; if they do so they risk loss of eligibility for numerous programs administered by Defendant USDA, without which they will have difficulty making a living.

3.      In 2017 and again in 2020, Plaintiffs submitted statutorily authorized requests that NRCS review the 2011 Certification. The 2020 request included significant new information not previously available that the Defendants did not consider in the 2011 Certification. Defendants USDA, NRCS, the NRCS South Dakota State Office, and associated Defendant public officials illegally refused to accept those requests in 2017 and in 2020.

4.      Plaintiffs contend that the federal government lacks the constitutional power to regulate the mud puddle or its use. Plaintiffs also contend that Defendants violated federal statutes when they refused to review the 2011 Certification in response to the Fosters' 2017 and 2020 requests. Plaintiffs finally contend that the 2011 wetland determination is no longer in effect as the result of the Fosters' 2017 and/or 2020 requests for review.

5.      Plaintiffs ask this Court for declaratory, injunctive, and other relief against Defendants as specified in the prayer for relief below.

**Jurisdiction and Venue**

6.      This Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 (judicial review of agency action) and 28 U.S.C. § 1331 (civil action arising under laws of the United States).

7.      Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 2201(a) and 2202, and to hold unlawful and set aside unlawful agency action under 5 U.S.C. § 706.

8.      Plaintiffs assert that Defendants' exercise of authority over Plaintiffs' property under the 16 U.S.C. § 3821, *et seq.*, exceeds the federal government's Commerce Power under Article I of the U.S. Constitution, and that Defendants' refusal to review their 2011 Certification under 16 U.S.C. § 3822(a)(4) constitutes unlawful, arbitrary, and capricious agency action. An actual controversy therefore exists between the parties.

9.      The federal government has waived sovereign immunity to this action under 5 U.S.C. § 702.

3

10.    Plaintiffs have exhausted all available and required administrative remedies.

11.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving raise to Plaintiffs' claims occurred in this district, because the property involved in this action is located entirely within this district, and because Plaintiffs reside in this district.

12.    This case is properly filed in the Sioux Falls Division of this District because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Miner County, South Dakota, because the property involved in this action is located entirely in Miner County, South Dakota, and because Plaintiffs reside in Miner County, South Dakota.

## Parties

### *Plaintiffs*

13.    Arlen and Cindy Foster (the Fosters) are a married couple who own a 50% interest in the farm field that is the subject of the claims in this action. They are residents of Miner County in South Dakota, about an hour West and North of Sioux Falls.

### *Defendants*

14.    Defendant United States Department of Agriculture (USDA) is a cabinet level agency of the United States government, and responsible for administering 16 U.S.C. §§ 3821-3822.

15.    Defendant Tom Vilsack is the Secretary of the USDA and is sued in his official capacity only.

16.     Defendant Natural Resources Conservation Service (NRCS) is a component agency of Defendant USDA. Administration of 16 U.S.C. §§ 3821-3822 is delegated from USDA to the NRCS.

17.     Defendant Terry Cosby is the Acting Chief of the Natural Resources Conservation Service and is sued in his official capacity only. His predecessor Leonard Jordon took the final agency action challenged herein refusing Plaintiffs' 2017 request under 16 U.S.C. § 3822(a)(4) to review the 2011 Certification on Plaintiffs' farm field.

18.     Defendant Laura Broyles is the Acting South Dakota State Conservationist for Defendant NRCS and is sued in her official capacity only. Her predecessor Jeffrey J. Zimprich, in his official capacity as South Dakota State Conservationist, took the final agency action challenged herein by refusing Plaintiffs' 2020 request under 16 U.S.C. § 3822(a)(4) to review the 2011 Certification on Plaintiffs' farm field.

## Facts

19.     Arlen Foster's grandfather acquired the property on which Plaintiffs' farm is presently located in 1900 with a $1,000 loan.

20.     In 1936 or shortly after, Arlen's father Gordon Foster developed a tree belt along the south edge of the farm field at issue in this case. The tree belt is roughly half a mile long (running West to East) and roughly 25 yards deep. Developing the tree belt would have involved mechanically plowing the ground before planting the trees, planting each of the 1,200-2,000 trees by hand or with a rudimentary mechanical planter, and then regular plowing between the rows of trees to keep

weeds down until the trees grew high enough to shade them out. Getting the tree belt well established would have required a number of years of attention and work. The trees are now 30-40 feet tall.

21.    The purpose of developing the tree belt was to prevent wind-driven soil erosion of the field and other farm fields and land in the vicinity. The tree belt consists mainly of Eastern Red Cedar, Cottonwood, Ash, and Plum species. It hosts deer, squirrels, and birds, including pheasants and the occasional wild turkey.

22.    At the time it was developed, the tree belt was a conservation measure encouraged by then-recently established Soil Conservation Service, which is the Defendant agency now titled the Natural Resources Conservation Service.

23.    Defendant NRCS still encourages the development of tree belts to prevent erosion.

24.    The Fosters' tree belt is very effective for this purpose and they intend to preserve it.

25.    Snow accumulates under the tree belt during South Dakota's stormy winters.

26.    In Spring the snow melts and drains northward across the field adjacent to where the tree belt was developed.

27.    Over the decades since the tree belt was developed, the mud puddle formed in the field close to the tree belt, in which puddle the melted snow from the tree belt ponds for periods of time. The mud puddle depends on the tree belt for its

existence; the tree belt is the primary source of the water that created the mud puddle. The mud puddle is approximately 0.8 acres, and approximately 8 inches deep.

28.     The tree belt development is and at all relevant times has been adjacent to the mud puddle at issue in this case. They lie close to each other, and nothing significant intervenes between them. There is no berm between them, for example.

29.     The mud puddle does not contribute flow to any downstream water body, navigable-in-fact or otherwise, during a typical year, as the term typical year is defined in 33 C.F.R. § 328.3(c)(13).

30.     The mud puddle is not "adjacent" to any other body of water, as the term adjacent is defined in 33 C.F.R. § 328.3(c)(1). The mud puddle does not border, is not contiguous to, and does not neighbor any other water body.

31.     The mud puddle does not have a significant chemical nexus with any downstream navigable-in-fact waterbody.

32.     The mud puddle does not have a significant physical nexus with any downstream navigable-in-fact waterbody.

33.     The mud puddle does not have a significant biological nexus with any downstream navigable-in-fact waterbody.

34.     The mud puddle, considered with similarly situated features, does not have a significant chemical nexus with any downstream navigable-in-fact waterbody.

35.     The mud puddle, considered with similarly situated features, does not have a significant physical nexus with any downstream navigable-in-fact waterbody.

36.     The mud puddle, considered with similarly situated features, does not have a significant biological nexus with any downstream navigable-in-fact waterbody.

37.     The mud puddle is not a "prairie pothole."

38.     The field in which the mud puddle sits also receives snowfall every winter and rainfall every spring. As the spring proceeds, the field dries out until the soil is dry enough to support the use of farm equipment, and the Fosters plant annual crops in the field.

39.     Because the mud puddle receives additional snow melt from the adjacently developed tree belt, it does not dry out at the same pace as the surrounding field. In roughly half of years, the mud puddle dries out soon enough that its soil also is dry enough to support the use of farm equipment by the time the rest of the field is. In those years, the Fosters produce an agricultural crop (in recent years, typically corn) on the entire 44-acre field, including the mud puddle and the immediately surrounding area.

40.     In some years with higher snowfall, however, the mud puddle does not dry out fast enough to allow the use of farm equipment in and around it before it is too late to plant a crop.

41.     In these "wetter years," the Fosters are unable to produce an agricultural crop either in the mud puddle or the surrounding portions of the field, totaling between 1.6 and 2 acres out of the 44 acres in the field, unless they were to drain the mud puddle to speed up its "drying out."

42.     To grow a crop on the puddle in those "wetter years" the Fosters would, if not impeded by regulation, drain the mud puddle by cutting a shallow ditch from the north edge of the mud puddle to the north edge of the field. Water would then drain from the mud puddle a little sooner than it would under natural conditions, and allow the Fosters to produce a crop in the drained mud puddle and immediately surrounding area.

43.     Producing an agricultural crop in and around the mud puddle (in those years the Fosters are able to do so without draining it) does not change the soils in the puddle, or the types of plants that the puddle would grow under natural conditions.

44.     Draining the mud puddle would only, in "wetter years," reduce the time during which the puddle is muddy by a few weeks.

45.     Absent draining the mud puddle for a few weeks in "wetter years," the Fosters are unable to produce an agricultural crop on the 1.6 to 2 acres that include that mud puddle and immediately surrounding area.

46.     The Fosters are content not to fill the mud puddle with soil. They only wish to speed up its naturally occurring annual "drying out" cycle in wetter years by a few weeks so they can produce an annual crop on it in those years.

47.     The Fosters have not drained the mud puddle in any way, and are impeded from doing this by federal regulation, as described more particularly below.

9

48.     The Fosters are eligible for and participate in a variety of programs authorized by the United States Congress and administered through various agencies of Defendant USDA.

49.     These include payments from the Commodity Credit Corporation (CCC) and/or the Farm Services Agency (FSA) under the Agriculture Risk Coverage (ARC) and Price Loss Coverage (PLC) programs authorized by the 2014 and 2018 Farm Bills and administered by those agencies.

50.     The Fosters also benefit from premium subsidies for crop insurance policies under the Federal Crop Insurance Act, 7 U.S.C. § 1501, *et seq.*

51.     Without eligibility for and participation in the ARC and PLC programs and benefiting from crop insurance premium subsidies, the Fosters would have difficulty making a living farming their land.

<u>Legal Background</u>

*The Swampbuster Act*

52.     In 1985, Congress established the Erodible Land and Wetland Conservation and Reserve Program, 16 U.S.C. § 3801, *et seq.*, provisions of which (the so-called "Swampbuster Act") restrict the use of "wetlands" in farm fields owned by recipients of USDA agricultural benefits, 16 U.S.C. §§ 3821-3822; *see generally*, *Clark v. U.S. Department of Agriculture*, 537 F.3d 934, 935-36 (8th Cir. 2008).

53.     The Swampbuster Act defines wetlands as land that combines wetland hydrology, hydric soils, and the ordinary production of plants that grow well in wet conditions. 16 U.S.C. § 3801(a)(27), *id.* § 3801(a)(12), (13).

54.    The Swampbuster Act disqualifies any person from eligibility for a wide variety of federally authorized agricultural benefit programs, *id*. § 3821(a), including ARC, PLC, and other payments made by the CCC, *id*. § 3821(b)(1), and premium subsidies for federally authorized crop insurance programs, *id*. § 3821(c), if that person drains a wetland and produces an agricultural commodity on it, *id*. § 3821(d)(1).

55.    This disqualification does not apply to "artificial wetlands," i.e., wetlands that are "temporarily or incidentally created as a result of adjacent development activity." *Id*. § 3822(b)(1)(F). "Adjacent" means "[l]ying near or close to." Black's Law Dictionary 62 (4th ed. 1968). "Development" means "a thing that is developed; [the] result of developing." Webster's New World Dictionary 401 (Collegiate ed. 1957). "Develop" means "to cause to grow gradually in some way[.] *Id*. "Incidental" means "[d]epending upon or appertaining to something else as primary[.]" Black's Law Dictionary, *supra*, 904.

56.    The Act's disqualification provisions only attach after Defendants USDA and NRCS delineate and determine the presence of a wetland in a person's farm field through a formal process called a "certification." 16 U.S.C. § 3822(a)(1)-(3).

57.    Final certifications "remain valid and in effect . . . until such time as the person affected by the certification requests review of the certification by the Secretary" of the USDA. *Id*. § 3822(a)(4). The Act places no limits or conditions on the affected person's right to request review of a final certification.

11

58.     Hence, once an affected person requests review of a prior certification, that certification is no longer valid or in effect.

*The Congressional Review Act*

59.     To restore democratic accountability to the federal bureaucracy, Congress enacted the Congressional Review Act (CRA), 5 U.S.C. § 801, *et seq.*, on March 29, 1996, requiring federal agencies to submit every new rule they adopt to Congress before the rule goes into effect. If our elected representatives disagree with an agency's rule, the CRA provides streamlined procedures for Congress and the President to pass a resolution disapproving the rule, which also prevents substantially similar rules from being adopted in the future.

60.     Agency compliance with the CRA's submission requirement has been spotty, a problem that the Congressional Research Service and Government Accountability Office have long warned agencies about. The statute is clear on the consequences of an agency's failure to comply: the rule cannot be implemented or given legal effect.

61.     The CRA provides for democratic accountability by requiring agencies to submit every rule they adopt to Congress for its review before the rule can go into effect. The statute provides:

> *Before a rule can take effect*, the Federal agency promulgating such rule *shall submit* to each House of the Congress and to the Comptroller General a report containing—(i) a copy of the rule; (ii) a concise general statement relating to the rule, including whether it is a major rule; and (iii) the proposed effective date of the rule.

5 U.S.C. § 801(a)(1)(A) (emphasis added).

62.     Once a rule is submitted—and only then—Congress can review the rule and, if it disapproves of it, pass a joint resolution voiding the rule using streamlined procedures. According to the statute, the disapproval resolution may only be introduced during "the period beginning on the date on which the report . . . is received by Congress and ending 60 days thereafter." 5 U.S.C. § 802(a). Thus, if an agency refuses to comply with the CRA's submission requirement, it denies our elected representatives their opportunity to consider the rule.

63.     Once a rule is submitted, each House of Congress has 60 legislative or session days (the House uses the term "legislative day," the Senate has "session days") to pass the joint resolution disapproving the rule. 5 U.S.C. § 802(a).

64.     Because these resolutions merely provide an up-or-down vote on the rule, they face fewer obstacles than other forms of legislation. In the Senate, resolutions of disapproval can (with 30 names on a discharge petition) bypass the relevant committees, are subject to a maximum 10 hours of floor debate, cannot be filibustered, and the resolution needs only a bare majority to pass. 5 U.S.C. § 802.

65.     If both Houses of Congress pass such a resolution, the joint resolution is sent to the President for his signature. *See* 142 Cong. Rec. S3683 (daily ed. Apr. 18, 1996) (explaining that the Congressional Review Act provides for bicameralism and presentment to comply with the Supreme Court's decision in *INS v. Chadha*, 462 U.S. 919 (1983)).

66.     If the President signs a joint resolution disallowing a rule, the CRA provides that the rule "shall not take effect[.]" 5 U.S.C. § 801(b). The agency is also

barred from reissuing the rule "in substantially the same form" or issuing a new rule "that is substantially the same" as the disapproved rule, unless Congress has enacted legislation in the interim to "specifically authorize[]" it. *Id.*

67.     The CRA defines "rule" broadly to ensure democratic oversight of much of what administrative agencies do. A rule is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4); 5 U.S.C. § 804(3)(C). It has only a few narrow exceptions for rules "of particular applicability," "relating to agency management or personnel," and "of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties." 5 U.S.C. § 804(3)(C). Every other rule must be submitted.

*Swampbuster Regulations*

68.     On September 6, 1996, Defendants USDA and NRCS promulgated a final interim rule with request for comments, interpreting various provisions of the Swampbuster Act. 61 Fed. Reg. 47,019 (Sept. 6, 1996). These regulations are codified at 7 C.F.R. §§ 12.1-12.13 and 12.30-12.34. ("Swampbuster Regulations").

69.     The Swampbuster Regulations are a statement of general applicability and future effect, by the Defendants USDA and NRCS, designed to implement and/or interpret the Swampbuster Act, and describe the organization, procedure, and practice requirements of Defendants USDA and NRCS with regard to the Swampbuster Act. The Swampbuster Regulations are therefore a "rule" within the meaning of the Congressional Review Act. 5 U.S.C. § 551(4); 5 U.S.C. § 804(3)(C).

70.    The Swampbuster Regulations were required to be submitted to Congress and the Comptroller General under the Congressional Review Act.

71.    Upon information and belief, neither Defendant USDA nor Defendant NRCS submitted the Swampbuster Regulations to Congress or the Comptroller General in compliance with the Congressional Review Act.

72.    A provision of the Swampbuster Regulation purports to revise the right, established by Congress in 16 U.S.C. § 3822(a)(4), of any person to request a review of a prior wetland certification, by imposing the following limitations:

> A person may request review of a certification only if a natural event alters the topography or hydrology of the subject land to the extent that the final certification is no longer a reliable indication of site conditions, or *if NRCS concurs with an affected person that an error exists in the current wetland determination.*

7 C.F.R. § 12.30(c)(6) (emphasis added) (the Review Regulation). As with the rest of the Swampbuster Regulations, the Review Regulation has not been submitted to Congress or the Comptroller General, in violation of the Congressional Review Act, and is not in effect, cannot be enforced against Plaintiffs, relied upon by Defendants, or deferred to by federal courts.

### The 2011 NRCS Wetland
### Certification on the Fosters' Farm Field

73.    In 2004, Defendant NRCS completed a wetland certification that determined that the mud puddle and other areas of the field in question were wetlands whose use was restricted by the Swampbuster Act.

74.    In 2008, the Fosters requested in writing that NRCS review the 2004 certification.

75.     NRCS agreed to review the 2004 certification without requiring compliance with the Review Regulation, and without requiring the Fosters to submit any new information.

76.     As a result of the 2008 review request, Defendant NRCS certified a new wetland delineation in 2011, which determined that 0.8 acres of the mud puddle is a wetland whose farming use is restricted by the Swampbuster Act.

77.     The Fosters took an administrative appeal from the 2011 Certification, in which USDA upheld the certification, and then sought judicial review of the 2011 Certification in this Court. This Court and the Eighth Circuit upheld the 2011 Certification on deference grounds. *See generally Foster v. Vilsack*, 820 F.3d 330 (8th Cir. 2016), *cert. denied*, 137 S. Ct. 620 (2017).

78.     On June 6, 2017, subsequent to the Supreme Court's denial of certiorari in *Foster v. Vilsack*, the Fosters submitted a request under 16 U.S.C. § 3822(a)(4) that Defendant NRCS review the 2011 Certification (the "2017 Request").

79.     On August 1, 2017, Defendant NRCS denied that request, based solely on the Review Regulation (the "2017 Denial").

80.     In April 2020, the Fosters submitted another request for review of the 2011 Certification (the "2020 Request"). This request was supported by a technical report that analyzes the volume of snow that accumulates within the tree belt development adjacent to the mud puddle, and demonstrates that the mud puddle was created incidentally to the development of the tree belt and is therefore an "artificial wetland."

81.     The information and analysis in this renewed request were not available to the Fosters or to Defendants USDA and NRCS prior to the 2011 Certification or during the administrative appeal to USDA from that certification.

82.     Defendant NRCS did not consider the information or analysis in the 2020 request when it completed the 2011 Certification.

83.     Despite this, Defendant NRCS again refused to review the 2011 Certification on May 14, 2020 (the "2020 Denial"). The 2020 Denial was again based exclusively upon the Review Regulation's requirement that the agency first agree with the Fosters that the prior certification was wrong before it would agree to review the prior certification.

84.     NRCS's 2017 Denial is a final agency action within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704.

85.     NRCS's 2020 Denial is a final agency action within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704.

86.     The Foster's seek judicial review of the 2017 and 2020 Denials, the two refusals to review the 2011 Certification. They do not seek judicial review of the 2011 Certification itself.

### Declaratory Relief Allegations

87.     The preceding paragraphs are incorporated herein.

88.     Plaintiffs contends that the Swampbuster Act exceeds Congress' Commerce Power and violates the Tenth Amendment and is therefore illegal, that the Review Regulation is not in effect pursuant to the Congressional Review Act, is ultra vires, unreasonable, and irrational, and therefore unenforceable, that

Defendants have a legal obligation to review the 2011 Certification, and that the 2011 Certification is no longer valid or in effect due to Plaintiffs' requests that it be reviewed. Plaintiffs are informed and believe that Defendants contest all of these contentions.

89.     No factual development is necessary to resolve this case as Plaintiffs raise pure legal challenges to the Swampbuster Act, the Review Regulation, and the Defendants' 2017 and 2020 Denials, on their face.

90.     Plaintiffs are injured by the Swampbuster Act, the Review Regulation, and Defendants' 2017 and 2020 Denials, because Plaintiffs hold beneficial interests in property on which they may not grow a crop in many years while remaining eligible for ARC and PLC payments from the CCC, crop insurance premium assistance, and other USDA agricultural benefit programs without which they would have difficulty making a living farming their land.

91.     Accordingly, an actual and substantial controversy exists between Plaintiffs and Defendants as to the parties' respective legal rights and responsibilities. A judicial determination of the parties' rights and responsibilities arising from this actual controversy is necessary and appropriate at this time.

### Injunctive Relief Allegations

92.     The preceding paragraphs are incorporated herein.

93.     Because of the Swampbuster Act, the Review Regulation, and the Defendants' 2017 and 2020 Denials, Plaintiffs are now forced to submit to federal regulation of their property in excess of federal constitutional and statutory

authority, and the 2011 Certification which Defendants illegally refuse to review, as a condition of eligibility for USDA agricultural program benefits.

94.     Plaintiffs will continue to be injured by the Swampbuster Act, the Review Regulation, the 2011 Certification, and the 2017 and 2020 Denials.

95.     Enjoining the enforcement of the Swampbuster Act, the Review Regulation, and the 2011 Certification will redress these harms.

96.     Plaintiffs have no plain, speedy, and adequate remedy at law and, absent judicial intervention, Plaintiffs do and will continue to suffer irreparable injury.

97.     If not enjoined, Defendants will enforce the Swampbuster Act, the Review Regulation, and the 2011 Certification against Plaintiffs.

## FIRST CLAIM FOR RELIEF

## DECLARATORY AND INJUNCTIVE RELIEF THAT THE SWAMPBUSTER ACT VIOLATES THE COMMERCE POWER AND TENTH AMENDMENT AND THE UNCONSTITUTIONAL CONDITIONS DOCTRINE

98.     The above allegations are incorporated by reference.

99.     Congress' power to regulate is limited by its enumerated powers under Article I, Section 8 of the United States Constitution. Environmental regulation is typically based solely upon the Commerce Power, which is limited in scope. *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 173-74 (2001); *United States v. Lopez*, 514 U.S. 549 (1995). Nor may Congressional regulation violate the Tenth Amendment, which reserves to the States all of the powers not delegated to the federal government in the Constitution, including the police power which is widely recognized as the power under which land

19

use and local water resource laws are enacted and enforced. Under the long-recognized doctrine of Unconstitutional Conditions, Congress may not condition the receipt of government benefits or payments on the recipients' waiver of a constitutional right, including the right to be free of ultra vires and unconstitutional federal regulation. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 72 (1990); *New York v. United States*, 505 U.S. 144, 181 (1992).

100.   The Swampbuster Act exceeds the Commerce Power and is unconstitutional.

101.   The Swampbuster Act does not regulate the channels of interstate commerce. Wetlands as such are land, 16 U.S.C. § 3801(a)(27) ("The term "'wetland' . . . means land" meeting specified criteria). They are not highways, waterways used to transport goods in interstate commerce, rail lines, or air traffic infrastructure.

102.   The Swampbuster Act does not regulate any instrumentalities of interstate commerce. Wetlands are not trucks, containers, aircraft, train cars, etc.

103.   The wetlands regulated by the Swampbuster Act are not articles in interstate commerce. They are portions of parcels of immovable real property and as such are not subject to Commerce Power regulation on this mere basis.

104.   Wetlands as such, and without more, have no substantial effect on interstate commerce.

105.   The mud puddle on the Fosters' farm field is not a channel or instrumentality of interstate commerce, is not goods in interstate commerce, and has no substantial effect on interstate commerce.

106.    The Swampbuster Act has no "jurisdictional provision." That is, it does not limit its definition of regulated wetlands to channels or instrumentalities of interstate commerce, goods in interstate commerce, or features having substantial effects on interstate commerce.

107.    The Swampbuster Act does not limit its regulation of wetlands to only those adjacent to water bodies that are actually navigable and used in or susceptible to use in transportation of goods in interstate commerce.

108.    The Swampbuster Act does not limit its regulation of wetlands to those wetlands having any other connection to interstate commerce. It universally regulates every wetland in the United States of America, however small, however ephemeral, and however distant or unconnected from any other water body, so long as it is on a farm.

109.    The Swampbuster Act does not contain findings that relate its restrictions on farming wetlands to the effectiveness of any USDA farm assistance program, nor do the Act's restrictions relate to or improve the effectiveness of any such programs. Indeed, the Swampbuster Act is in Title 16 of the United States Code, dealing with Conservation, not Title 7 dealing with Agriculture.

110.    The Swampbuster Act violates the Tenth Amendment and is unconstitutional.

111.    The Swampbuster Act regulates the use of water resources and real property as though it were an exercise of local land use authority under the states' retained police powers, in violation of the Tenth Amendment.

112.   The Swampbuster Act contains no clear statement of Congress' intent to regulate to the outer extent of its Commerce Power.

113.   The Fosters' use and intended use of their farm field and the mud puddle to grow crops is consistent with local and South Dakota land use law and regulation.

114.   Congress could not directly impose the Swampbuster Act under the Commerce Power or the Tenth Amendment. That is, the federal government could not enforce a "stand alone" law prohibiting all farmers from draining or filling all wetlands as defined in the Act. The Swampbuster Act requires those it regulates to submit to this unconstitutional control of their private property by the Congress and Defendants as a condition of the distribution of federal agricultural benefits, in violation of the Unconstitutional Conditions doctrine.

115.   The Court should declare the Swampbuster Act unconstitutional and enjoin its enforcement against Plaintiffs.

## SECOND CLAIM FOR RELIEF

### DECLARATORY RELIEF THAT THE REVIEW REGULATION IS AND WAS NOT IN EFFECT UNDER THE CONGRESSIONAL REVIEW ACT

116.   The above allegations are incorporated by reference.

117.   16 U.S.C. § 3822(a)(4) imposes on the Defendants a mandatory duty to accept both Plaintiffs' 2017 and 2020 Requests to review the 2011 Certification.

118.   Defendants refused to accept either request, based solely in each case on the Review Regulation.

119.   The Review Regulation has not been submitted to Congress or the Comptroller General as required by the Congressional Review Act, and is therefore not in effect.

120.   For the foregoing reasons, the Review Regulation cannot be enforced against Plaintiffs.

121.   This Court should declare that the Review Regulation is not in effect as a result of Defendants' failure to comply with the Congressional Review Act, that it was not in effect for the same reason at the times that Plaintiffs submitted their 2017 and 2020 Requests for review and Defendants rejected them, and order Defendants to accept the 2017 and 2020 Requests.

### THIRD CLAIM FOR RELIEF

### DECLARATORY RELIEF THAT THE REVIEW REGULATION VIOLATES THE SWAMPBUSTER ACT AND DUE PROCESS CLAUSE OF THE U.S. CONSTITUTION

122.   The above allegations are incorporated by reference.

123.   16 U.S.C. § 3822(a)(4) imposes on the Defendants a mandatory duty to accept the 2017 and 2020 Requests for review of the 2011 Certification.

124.   Defendants' 2017 and 2020 Denials were based solely on the Review Regulation.

125.   The Review Regulation violates 16 U.S.C. § 3822(a)(4) by imposing conditions on Plaintiffs' right to request review of prior certifications, which conditions exceed the scope of the statute.

126.   The Review Regulation is not a delegated or reasonable interpretation of 16 U.S.C. § 3822(a)(4) and is therefore not entitled to deference from federal courts.

The Review Regulation limits the right to request review of prior certifications to those cases where the Defendants already agree that the prior certification is wrong. This amounts to: "we won't even think about it unless we already agree with you." This is an unreasonable and irrational interpretation of the statute, which imposes no limits at all on the right to request review.

127.   The Review Regulation violates the Due Process Clause by creating an adjudicatory decision-making process which is rigged against the requestor. The statute entitles the requestor to request review, which creates a ministerial duty on the part of Defendants to accept the request for review. The Review Regulation replaces this ministerial duty with an adjudicative decision-making process, in which the Defendants decide whether the requestor meets the criteria to request review.

128.   That decision (whether the agency already agrees that its prior certification is wrong) by definition predetermines the outcome of the review itself: if the agency does not think it was wrong, the review ends before it started as the perverse result of a non-transparent review of the prior certification to determinate whether it was wrong. And if the agency agrees that it was wrong, then the review will automatically succeed. This violates a federal agency's Due Process obligation to avoid predetermining the outcomes of adjudicative decisions.

129.   The Review Regulation also violates the Due Process Clause by denying the requestor a meaningful opportunity to be heard on the question of whether the prior certification was wrong. As structured in the Review Regulation, "whether we were wrong before" is a black box determination made in secret by the agency, with

no notice to the requestor of how that determination would be made, and no opportunity to be heard on the matter or to rebut the information on which the agency makes the decision. It is tantamount, in judicial terms, to only being allowed to file a complaint if the judge already agrees that your claims would prevail.

130.   The 2020 Request for review includes substantial technical information which was not available to either Plaintiffs or Defendants prior to Defendant NRCS's final action on the 2011 Certification. A decade has passed since then, and new information is available about the way in which the mud puddle was incidentally created by the adjacent development of the tree belt and is therefore an unregulated "artificial wetland." This information would meet any reasonable regulatory standard that would require the presentation of new information as a condition for requesting review.

131.   For the foregoing reasons, the Review Regulation violates the Swampbuster Act and the Due Process Clause of the United States Constitution, and the Defendants may not legally implement it or enforce it against Plaintiffs.

132.   This Court should declare that the Review Regulation violates the Swampbuster Act and/or the Due Process Clause, and enjoin the Defendants from implementing it or enforcing it against Plaintiffs.

### FOURTH CLAIM FOR RELIEF

### VACATING AND SETTING ASIDE
### THE 2017 AND 2020 DENIALS UNDER THE APA

133.   The above allegations are incorporated by reference.

134.   16 U.S.C. § 3822(a)(4) imposes on the Defendants a mandatory duty to accept the 2017 and 2020 Requests for review of the 2011 Certification.

135.   Defendants' refusals to accept the Requests for review were based solely on the Review Regulation.

136.   The Review Regulation violates 16 U.S.C. § 3822(a)(4) by imposing conditions on Plaintiffs' right to request review of prior certifications that exceed the scope of the statute and violate the Due Process Clause, and is illegal and unenforceable for the reasons set forth above.

137.   The 2017 Request complied with 16 U.S.C. § 3822(a)(4) and Defendants had a legal duty to accept it.

138.   The 2020 Request complied with 16 U.S.C. § 3822(a)(4) and Defendants had a legal duty to accept it.

139.   The 2020 Request included substantial technical information which was not available to either Plaintiffs or Defendants prior to Defendant NRCS' final action on the 2011 Certification. A decade has passed since then, and new information is available about the way in which the mud puddle was incidentally created by the adjacent development of the tree belt and is therefore an unregulated "artificial wetland." This information would meet any reasonable regulatory standard that would require the presentation of new information as a condition for requesting review.

140.   Defendants' 2020 Denial was based in part on the assertion that the 2011 Certification already examined the information on snow melt from the tree belt,

which Plaintiffs submitted for the first time in the 2020 Request for review. Plaintiffs are informed and believe and therefore allege that there is no substantial evidence in the record of the 2020 Denial to support that basis for the decision.

141.   For the foregoing reasons, the Defendants' 2017 and 2020 Denials of Plaintiffs' 2017 and 2020 Requests for review of the 2011 Certification are arbitrary and capricious, unlawfully withheld agency action, and/or otherwise contrary to law.

142.   Plaintiffs respectfully request that this Court set aside the 2017 and 2020 Denials and order Defendants to accept Plaintiffs' 2017 and 2020 Requests.

## FIFTH CLAIM FOR RELIEF

### DECLARATORY RELIEF THAT THE 2011 CERTIFICATION IS NO LONGER VALID OR IN EFFECT DUE TO THE 2017 AND/OR 2020 REQUESTS FOR REVIEW

143.   The above allegations are incorporated by reference.

144.   16 U.S.C. § 3822(a)(4) states that upon a request for review of a wetland certification, the prior certification is no longer valid or in effect.

145.   Plaintiffs have made two requests for review of the 2011 Certification since it become final, one in 2017 and one in 2020. Both of these requests satisfied the statute and Defendants were obligated to accept them.

146.   For the reasons stated above, paragraphs 116 to 142, Defendants' refusal to accept either request was in violation of the law.

147.   Plaintiffs ask this Court to issue a declaratory judgment that the Plaintiffs' 2017 and 2020 Requests for review of the 2011 Certification were legally sufficient under the statute, and that as a result of those requests, the 2011 Certification is no longer valid or in effect.

## Prayer for Relief

Wherefore, Plaintiffs pray for relief as follows, that the Court:

1.      Issue a declaratory judgment that the Plaintiffs' 2017 and 2020 Requests for review of the 2011 Certification were legally sufficient under the statute.

2.      Issue a declaratory judgment that the 2011 Certification is no longer valid or in effect, by virtue of the 2017 and 2020 Requests for review of that Certification.

3.      Issue a preliminary and permanent injunction ordering Defendants not to use the 2011 Certification as the basis for any determination of ineligibility under the Swampbuster Act.

4.      Set aside and vacate the Defendants' 2017 and 2020 final Denials refusing to accept Plaintiffs' 2017 and 2020 Requests for review of the 2011 Certification.

5.      Issue a declaratory judgment that the Review Regulation is not in effect because it has not been submitted to Congress or the Comptroller General as required by the Congressional Review Act.

6.      Issue a declaratory judgment that the Review Regulation is ultra vires because it is not authorized by the Swampbuster Act, is an unreasonable interpretation of the Swampbuster Act, and/or violates the Due Process Clause.

7.      Issue a preliminary and permanent injunction ordering Defendants not to enforce the Review Regulation.

8.    Issue a declaratory judgment that the Swampbuster Act exceeds Congressional authority under the United States Constitution and violates the Unconstitutional Conditions Doctrine;

9.    Issue a preliminary and permanent injunction ordering the Defendants not to enforce the Swampbuster Act against Plaintiffs; and

10.   Award Plaintiffs their costs and attorneys' fees, and such other relief as the Court determines is just.

Dated this 5th Day of May, 2021.

Respectfully submitted,

/s/ Christopher D. Sommers
Christopher D. Sommers
Redstone Law Firm LLP
1300 W. 57th Street, Suite 101
Sioux Falls, SD 57108
Telephone: (605) 444-2801
Email: chris@redstonelawfirm.com

ANTHONY L. FRANÇOIS*
Cal. Bar No. 184100
JEFFREY W. McCOY*
Cal. Bar No. 317377
Pacific Legal Foundation
930 G Street
Sacramento, CA 95814
Telephone: (916) 419-7111
Email: AFrancois@pacificlegal.org
Email: JMcCoy@pacificlegal.org
* Pro Hac Vice Pending

*Counsel for Plaintiffs*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

FOSTER, ARLEN; FOSTER, CINDY

**DEFENDANTS**

UNITED STATES DEPARTMENT OF AGRICULTURE, et al. (see attachment)

**(b)** County of Residence of First Listed Plaintiff   Hanson
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Christopher Sommers, Redstone Law Firm, LLP, 1300 W. 57th St., Ste. 101, Sioux Falls, SD 57108 (605) 331-2975

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☒ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Product Liability | |     28 USC 157 |     3729(a)) |
| ☐ 140 Negotiable Instrument |     Liability   ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &     Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
|     & Enforcement of Judgment |     Slander     Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'     Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted |     Liability   ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
|     Student Loans | ☐ 340 Marine     Injury Product | |     New Drug Application | ☐ 470 Racketeer Influenced and |
|     (Excludes Veterans) | ☐ 345 Marine Product     Liability | | ☐ 840 Trademark |     Corrupt Organizations |
| ☐ 153 Recovery of Overpayment |     Liability   **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
|     of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards |     Act of 2016 |     (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending |     Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract |     Product Liability   ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** |     Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal     Property Damage |     Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise |     Injury   ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury -     Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) |     Exchange |
| |     Medical Malpractice |     Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee |     Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff |     Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/     Sentence | |     or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability |     Accommodations   ☐ 530 General | | ☐ 871 IRS—Third Party | ☒ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** |     26 USC 7609 |     Act/Review or Appeal of |
| |     Employment   **Other:** | ☐ 462 Naturalization Application | |     Agency Decision |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| |     Other   ☐ 550 Civil Rights |     Actions | |     State Statutes |
| | ☐ 448 Education   ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| |     Conditions of | | | |
| |     Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 U.S.C. § 702

Brief description of cause:
Challenge under Administrative Procedure Act to USDA/NRCS refusal to review wetland certification under 16 U.S.C. § 3822(a)(4)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 5/5/2021 | /s/ Christopher Sommers |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**Attachment to Civil Cover Sheet**

**Defendants:**
UNITED STATES DEPARTMENT OF AGRICULTURE;
VILSACK, TOM, in his official capacity as Secretary of the United States Department of
Agriculture;
NATURAL RESOURCE CONSERVATION SERVICE;
COSBY, TERRY, in his official capacity as Acting Chief of the Natural Resource Conservation
Service;
BROYLES, LAURA, in her official capacity as Acting South Dakota State Conservationist