# TAB 21

Foster Request for Review
001220

UNITED STATE DEPARTMENT OF AGRICULTURE
OFFICE OF THE SECRETARY
NATIONAL APPEALS DIVISION

| | | |
|---|---|---|
| In the matter of | ) | |
| | ) | |
| ARLEN & CINDY FOSTER | ) | |
| | ) | |
| And | ) | Case No. 2011W000619 |
| | ) | |
| NATURAL RESOURCES CONSERVATION SERVICE | ) | |

## APPEAL DETERMINATION

Arlen and Cindy Foster (Appellant) filed an appeal challenging a Natural Resources Conservation Service (NRCS or Agency) adverse decision dated June 23, 2011. Agency issued a final wetland determination finding .8 acres of Tract 400 (Site 1) is wetland farmed under natural conditions.

Appellant argues the determination is not proper, in that it is not in accordance with required procedures and regulations. Specifically they challenge the Agency's comparison site used to determine the hydrology of the vegetation. They claim the site is too far away, receives more moisture, and is not similar enough to Site 1. They also argue there are at least two alternative sites proposed by Appellant that would be better. Next, they argue the Agency's use of aerial photographs to determine saturation and inundation was improper. Appellant contends their use was improper because South Dakota has not adopted an offsite methods manual. Additionally, Appellant's observations and monitoring of two holes indicate Site 1 does not have sufficient water levels to be a wetland. Finally, Appellant suggests the snowmelt from the 4-10 feet of snow in the shelterbelt is the cause of any wetland characteristics found at Site 1. Appellant argues Site 1 is an artificial wetland and not a wetland farmed under natural conditions.

At Appellant' request, I held an in person hearing on October 18, 2011. I held the record open for Appellant to submit their closing argument in writing. After Appellant submitted their closing argument, Agency requested an opportunity to respond to several arguments raised for the first time. I held the record open to allow the Agency to respond. I received all documents from the parties by November 23, 2011, and I closed the record on November 25, 2011. The Western Regional Assistant Director granted an extension until January 10, 2012 to issue the determination. Based on the evidence and the arguments submitted by the parties, and the program regulations that apply to this situation, I conclude the Agency decision was not in error. The rationale for my decision follows.

## BACKGROUND

Foster Request for Review
001221

Arlen & Cindy Foster
Case No. 2011W000619

The highly erodible land and wetland conservation rules set out in the Food Security Act of 1985 encourage participants in United States Department of Agriculture (USDA) programs to adopt land management measures to protect wetland functions and values. The law does this by linking eligibility for USDA program benefits to farming practices on wetlands. *See* Title 16 of the United States Code (16 U.S.C.) Sections (§§) 3801 *et seq*. Specifically, after November 28, 1990, a program participant is ineligible for USDA program benefits if there is a conversion of a wetland that makes possible the production of an agricultural commodity. The purpose of this provision is to remove incentives to produce agricultural commodities on such lands. The purpose of limiting production is to (1) reduce soil loss because of wind and water erosion; (2) protect the nation's long-term capacity to produce food and fiber; (3) reduce sedimentation (4) improve water quality; and (5) aid in preserving the nation's wetlands. *See* Title Seven Code of Federal Regulations (7 C.F.R.) § 12.1(b)(1-4). In order to determine compliance with the wetlands provisions, NRCS determines if a producer's land has wetlands that are subject to the provisions of the Food Security Act and provides other technical assistance. *See* 7 C.F.R. § 12.30(a)(1-8).

In order for NRCS to classify a site as a wetland, it must meet three criteria. There must be a predominance of hydric soils, sufficient water to support hydrophytic vegetation (hydrology) and a prevalence of hydrophytic vegetation. *See* 7 C.F.R. § 12.2 Definitions, Wetland. NRCS, along with other federal agencies, developed scientific procedures used to test for and determine whether a site meets the wetland criteria.

## STATEMENT OF THE ISSUES

I had to determine whether Agency correctly applied its regulations when it determined Site 1 to be a wetland. To make this determination, I had to resolve the following questions:

1. **Did NRCS properly determine Site 1 meets the wetland criteria of hydric soils, hydrophytic vegetation, and wetland hydrology?**

2. **Was NRCS' onsite visit in November sufficient to make a proper wetland determination?**

3. **Did NRCS properly determine Site 1 is not an artificial wetland?**

## FINDINGS OF FACT (FOF)

PROCEDURAL HISTORY

1. Appellant operates land identified as southeast quarter of Section 28, Township 105 North, Range 58 West, in Miner County South Dakota. (Agency Record (AR) pages 31 & 39, Agency Testimony, Hearing Audio(HA) Track 1, 00:23:33 – 00:23:45)

2

Foster Request for Review
001222

Arlen & Cindy Foster
Case No. 2011W000619

2.  The National Wetland Inventory (NWI) completed in 1983 and 1984 identified Site 1 as a temporary wetland. (AR page 41, Agency Testimony, HA Track 1, 00:27:40 – 00:28:01 & 00:30:41 – 00:31:04)

3.  In May 2003, NRCS made a field visit to Site 1. (Appellant's Brief page 20) In 2004, NRCS made an initial wetland technical determination that Site 1 (then referred to as Site 18) was a wetland. Appellant contested the determination and requested a review. (AR page 22, Appellant Testimony, HA Track 3, 00:38:34 – 00:39:00)

4.  In July 2008, Appellant requested a new determination via form AD-1026. In May 2009, NRCS made a second field visit to Site 1. (Appellant's Brief page 20) In 2009, NRCS issued a second determination finding Site 1 to be a wetland. NRCS rescinded the 2009 determination. On November 23, 2010, NRCS completed a third visit to Site 1. NRCS issued a final determination on June 23, 2011 finding Site 1 to be a wetland. (AR page 22, Appellant Testimony, HA Track 3, 00:38:34 – 00:39:00)

5.  The June 2011 determination was independent and did not rely on any data gathered from the determinations in 2003 and 2009. (Agency Testimony, HA Track 2, 01:01:34 – 01:01:59)

PRELIMINARY FINDINGS

6.  Site 1 is located in the Great Plains Region as identified by the Army Corp of Engineers. (AR page 330, Agency Testimony, HA Track 1, 00:25:15 – 00:25:23) The soil type is Tetonka on the soil survey. Tetonka soil types are on the county's hydric soils list. (AR page 49 & Agency Testimony, HA Track 1, 00:27:08 – 00:27:34) Site 1 receives between 21 and 23 inches of precipitation a year. (AR page 100)

7.  NRCS found no manipulations prior to 1985. (Agency Testimony, HA Track 1, 00:28:20 – 00:28:26)

8.  Normal circumstances were present as Site 1 is in row crop production as it has been since at least 1981. (Agency Testimony, HA Track 1, 00:29:00 – 00:29:23)

9.  There are no hydrolic manipulations such as a ditch or tile. (Agency Testimony, HA Track 1, 00:29:23 – 00:29:28)

10. There is a shelterbelt located on the south edge of the field. It exists in all available aerial photography. Appellant's relatives originally planted the shelterbelt in 1936. (AR page 72, Agency Testimony, HA Track 1, 00:29:28 – 00:29:53). Snow drifts in the shelterbelt range from 4 to 10 feet high. (Appellant Testimony, HA Track 3, 00:21:47 – 00:22:17) Snow in the shelterbelt takes about 30 days longer to melt than snow in the fields. (Appellant Testimony, HA Track 3, 00:22:17 – 00:24:07) The snowmelt drains into Site 1. (Appellant Testimony, HA Track 3, 00:24:07 – 00:24:24)

Foster Request for Review
001223

Arlen & Cindy Foster
Case No. 2011W000619

11. According to the NWI, Site 1 is located in a pothole region with many small depressions. (Agency Testimony, HA Track 1, 00:30:29 – 00:30:40)

12. The NWI identifies Site 1 as a temporary seasonal wetland indicating the site periodically lacks hydrology and could have a wetland plant community. (Agency Testimony, HA Track 1, 00:30:50 – 00:31:00 & 00:31:40)

13. NRCS determined Site 1 is a concave area and naturally ponds water. (Agency Testimony, HA Track 1, 00:49:08 – 00:49:20)

WETLAND TECHNICAL DETERMINATION

Hydrology

14. Michelle Burk is an Agricultural Engineer for NRCS. She has a B.S. degree in Agricultural Engineering and is a licensed agricultural engineer in the state of South Dakota. She works for NRCS and has 21 years of experience. She has 18 years experience making wetland determinations and has appropriate wetland determination authority from NRCS. (Agency Testimony, HA Track 1, 00:20:49 – 00:21:20)

15. The Agricultural Engineer completed an onsite determination on November 23, 2010. She identified Site 1 as a pothole with a depth of ponding of approximately .7 feet. At that depth, the site normally overflows towards the north. (AR pages 94 – 98, Agency Testimony, HA Track 1, 01:03:29 – 01:04:07) She identified this geomorphic condition as a secondary indicator of hydrology. (Agency Testimony, HA Track 1, 01:14:53 – 01:15:02)

16. The field visit was outside the period of normal environmental conditions. Normal precipitation measurements for May and June for Site 1 are between 6 and 8 inches. (AR pages 73 & 74, Agency Testimony, HA Track 1, 01:10:10 – 01:11:13). Normal precipitation for November is between 3/4 and 1½ inches. (AR pages 75 & 76, Agency Testimony, HA Track 1 00:12:15 – 01:13:32)

17. Because NRCS visited the site outside of the normal environmental conditions, NRCS relied on remote sensing to make a hydrology determination. NRCS compared annual aerial photography (also called slides) of Site 1 from 1991 through 2010 taking into account the amount of rainfall received in the three months prior to the photo. NRCS determined a wetland signature indicated by a change in color tone in 7 of the 10 years when there was normal rainfall. (AR pages 87 & 88, Agency Testimony, HA Track 1 01:22:26 – 01:28:00)

18. In 2003, NRCS also used remote sensing to determine hydrology for Site 1. NRCS determined there was a wetland signature in 5 of 9 years with normal precipitation. (Agency Testimony, HA Track 2, 01:02:00 – 01:03:07)

Foster Request for Review
001224

Arlen & Cindy Foster
Case No. 2011W000619

Hydric Soils

19. Eugene Preston (Soil Scientist) is a soil scientist employed by NRCS for 24 years. He has 15 years experience making wetland determinations. He also has appropriate job approval authority. (Agency Testimony, HA Track 2, 00:18:10 – 00:18:31)

20. Soil Scientist made an onsite visit on November 23, 2010 to determine whether there was a prevalence of hydric soils on Site 1. (AR page 468)

21. Soil Scientist took six soil samples from within the boundary of Site 1 and two outside the boundary. (AR page 52, Agency Testimony, HA Track 2, 00:27:43 – 00:28:54)

22. The six samples taken within the boundary of Site 1 contained a predominance of hydric soils with soil indicators of F6, F8, and A11 with redox concentrations. The redox features and the soil indicators of F6, F8, and A11 are primary indicators of hydric soils. (AR pages 53 – 62, Agency Testimony, HA Track 2, 00:29:40 – 00:32:28 & 00:33:50 – 00:34:26 & 00:43:38 – 00:44:08)

23. Redox features occur in wet conditions. They form when iron accumulates due to the natural chemical and biological reactions to the lack of oxygen. Redox features are an indicator of hydric soils. (Agency Testimony, HA Track 2, 00:39:15 – 00:40:21)

24. The hydric soil samples within the boundary of Site 1 contained an argillic horizon, which is consistent with Tetonka soils in wetland areas. (AR pages 53 -62, Agency Testimony, HA Track 2, 00:47:23 – 00:51:01)

25. An argillic horizon takes a very long time to form and indicates the natural characteristics and hydrologic features needed to create it were in place long before the shelterbelt existed. (Agency Testimony, HA Track 2, 01:38:48 – 01:39:49)

26. The predominant soil type at Site 1 was consistent with the official series description of Tetonka soils. (Agency Testimony, HA Track 2, 00:33:30 – 00:33:50)

27. The two soil samples outside the wetland boundary did not contain a prevalence of hydric soils. (AR pages 56 & 60, Agency Testimony, HA Track 2, 00:44:06 – 00:45:32)

28. The Soil Scientist took a ninth soil sample outside the boundary of Site 1 and next to the shelterbelt. The soil sample between the Site 1 and the shelterbelt is an upland soil and not a hydric soil. (AR page 61, Agency Testimony, HA Track 2, 00:51:01 – 00:54:38)

Hydrophytic Vegetation

29. Kevin Luebke is a South Dakota NRCS state biologist and has two years of experience with NRCS. Prior to 2009, he conducted wetland delineations for the Corp of Engineers

5

Foster Request for Review 001225

Arlen & Cindy Foster
Case No. 2011W000619

for nine years. He has appropriate wetland job approval authority from NRCS. (Agency Testimony, HA Track 2, 01:12:17 – 01:12:51)

30. Because Site 1 is under agricultural management, there is insufficient or unreliable vegetation to make a hydrophytic vegetation determination. (Agency Testimony, HA Track 2, 01:13:08 – 01:13:37)

31. To determine if Site 1 met the hydrophytic vegetation requirement, NRCS used a comparison site. (Agency Testimony, HA Track 2, 01:17:00 - 01:17:42) The comparison site selected was a Tetonka comparison site located in Kingsbury County, the northwest quarter of section 27, township 110, range 56 west from an approved list of sites previously established. (Agency Testimony, HA Track 2, 01:21:19 – 01:21:30)

32. The comparison site has a Tetonka soil type (Agency Testimony, HA Track 2, 01:26:46 – 01:26:58), is identified as a pothole (Agency Testimony, HA Track 2, 01:28:42 – 01:28:47), and receives between 23 -25 inches of precipitation annually. (AR pages 43 & 100, Agency Testimony, HA Track 2, 01:32:44 – 01:33:04)

33. The NWI identified the comparison site as a seasonal wetland. Seasonal and temporary wetlands are similar as both have the same ephemeral characteristics, meaning they periodically lack hydrology. (Agency Testimony, HA Track 2, 01:27:00 – 01:27:43)

34. The comparison site and Site 1 are both located in the major land resource area titled 55C. (Agency Testimony, HA Track 2, 01:30:38 – 01:31:01)

35. In July 2000, NRCS conducted the hydrophytic vegetation analysis on the comparison site. (AR pages 84, 660 – 665, Agency Testimony, HA Track 2, 01:23:38 – 01:24:17)

36. The comparison site had a prevalence index of 2.05. Any prevalence index of three or less indicates hydrophytic vegetation is prevalent on the site. (Agency Testimony, HA Track 2, 01:23:14 – 01:23:29)


## DISCUSSION

Seven C.F.R. § 11 governs the appeal. Seven C.F.R. § 12 governs the issues on appeal. I also consulted the 2002 Natural Resources Conservation Service South Dakota Mapping Conventions for Determining Wetlands (SD Mapping Conventions), the December 2010 National Food Security Act Manual (NFSAM), the Food Security Act Wetland Identification Procedures, and the January 1987 Corp of Engineers Wetlands Delineation Manual.

1. **Did NRCS properly determine Site 1 meets the wetland criteria of hydric soils, hydrophytic vegetation, and wetland hydrology?**

Foster Request for Review
001226

Arlen & Cindy Foster
Case No. 2011W000619

Yes. NRCS properly determined Site 1 meets the wetland criteria of hydric soils, wetland hydrology, and hydrophytic vegetation. Wetland means land that: 1) has predominance of hydric soils, 2) is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions, and 3) under normal circumstances supports a prevalence of such vegetation. *See* 7 C.F.R. § 12.2. Appellant contends there is insufficient water for the site to meet the hydrology requirement of a wetland and they disagree with the Agency's method in their hydrophytic vegetation determination. To address Appellant's arguments, I must consider whether NRCS properly considered all three factors: hydric soils, hydrology, and hydrophytic vegetation. All three factors must exist for a wetland determination. Therefore, I address each factor as follows.

**Hydric Soils**

Site 1 has a predominance of hydric soils. The rules define hydric soils as soils that, in an undrained condition, are saturated, flooded, or ponded long enough during a growing season to develop an anaerobic condition that supports the growth and regeneration of hydrophytic vegetation. *See* 7 C.F.R. § 12.2, definitions. NRCS identifies hydric soils by using published soil maps, which reflect soil surveys completed by NRCS or by using on-site reviews. *See* 7 C.F.R. § 12.31(a)(1). NRCS identifies hydric soils using the National List of Hydric Soils in conjunction with NRCS soil surveys to predict the location and properties of hydric soils in a given county or similar area. NRCS maintains an official list of local hydric soils in the Soil Data Mart. The National List of Hydric Soils is an aggregation of the local hydric soils lists produced from Soil Data Mart data. NRCS will also apply the publication "Field Indicators of Hydric Soils in the United States" to identify and delineate soils that would meet the definition of hydric soils in the field. *See* NFSAM, Part 514.4 (B)(1) - (2) and (C)(2).

NRCS followed proper procedures in determining that Site 1 has a predominance of hydric soils. NRCS used two methods in the hydric soil determination. NRCS reviewed the soil map of Site 1, which identified the soil type as Clarno-Stickeny-Tetonka. The county soil list identifies Tetonka as a hydric. (FOF 6) NRCS also studied six soil samples taken from Site 1 and three from the surrounding area. (FOF 21 & 28) NRCS found F6, F8, and A11 soil profiles with redox concentrations within the boundary of Site 1. (FOF 22 & 23) NRCS used the Field Indicators of Hydric Soils to identify the F6, F8 and A11 profiles with redox concentrations as hydric soils. (FOF 22) NRCS also identified an agrillic horizon from the soil samples taken within the boundary of Site 1. (FOF 24 & 25) An agrillic horizon is a characteristic found in Tetonka hydric soils. (FOF 24) Both the soil map and the soil samples provide current applicable data and indicate Site 1 has a predominance of hydric soils. Therefore, the rules support NRCS's determination that Site 1 has hydric soils.

**Hydrology**

Site 1 has wetland hydrology. The rules require NRCS to use wetland hydrology indicators in combination with indicators of hydric soils and hydrophytic vegetation to determine whether an area is a wetland. The function of wetland hydrology indicators is to provide evidence that the

7

Foster Request for Review
001227

Arlen & Cindy Foster
Case No. 2011W000619

site has a continuing wetland hydrologic regime and that hydric soils and hydrophytic vegetation are not relics of a past hydrologic regime. *See* NFSAM, Part 514.6 (B). To meet the hydrology requirement of a wetland a site must have one primary or two secondary hydrologic indicators. When the hydrologic indicators are lacking, NRCS uses remote sensing to look for indicators of a wetland signature. *See* SD Mapping Conventions SD-LTR-31 Steps 1 & 2. (AR page 147)

In this case, NRCS' preliminary findings and onsite visit only identified one secondary indicator of hydrology, a concave topography subject to ponding. (FOF 15) Because there were insufficient primary and secondary indicators, NRCS used remote sensing to make their hydrology determination. *See* SD Mapping Conventions SD-LTR-31 Step 3. (AR page 148) Remote sensing requires NRCS to review aerial photography (also called slides) from a 20-year period ending with the current year. NRCS reviews the photographs for indicators of a wetland signature. Indicators of a wetland signature include the following:

- hydrophytic vegetation
- surface water
- saturated conditions
- flooded or drowned-out crops
- stressed crops due to wetness
- differences in vegetation due to different planting dates
- inclusion of wet areas as set aside or idled
- circular or irregular areas of unharvested crops within a harvested field
- isolated areas that are not farmed with the rest of the field
- areas of greener vegetation (especially during dry years).

*See* SD Mapping Conventions SD-LTR-33. (AR page 149) If there is a wetland signature in more than 50% of years with normal rainfall then a site meets the hydrology requirement of a wetland. *See* SD Mapping Conventions SD-LTR-33 Step 2. (AR page 149) NRCS reviewed aerial photography from 1991 through 2010 and identified a wetland signature in 7 of the 10 years with normal rainfall. (FOF 17)

NRCS followed proper procedures in determining wetland hydrology on Site 1. Their preliminary findings and onsite visit identified one secondary indicator of hydrology, a concave topography subject to ponding. Because there were insufficient primary and secondary indicators, NRCS proceeded to remote sensing as outlined in step 3 of the SD Mapping Conventions, SD-LTR-31. (AR page 148) They reviewed available aerial photographs taken during the growing season from 1991 to 2010. NRCS identified a wetland signature in 7 of the 10 years with normal rainfall. Because the review of the aerial photography showed a wetland signature in more than 50% of the years with normal rainfall, NRCS properly determined Site 1 has the required hydrology to be a wetland.

<u>Remote Sensing and SD Mapping Conventions</u>

8

Foster Request for Review
001228

Arlen & Cindy Foster
Case No. 2011W000619

Appellant argues the National Engineering Handbook, Chapter 19, Part 650  paragraph 5-3(2)(i) only permits the use of Chapter 19 tools, remote sensing in this case, if they are contained in a state offsite methods manual.  (AR page 159)  Appellant argues NRCS improperly used remote sensing because South Dakota has never adopted an offsite methods manual.  Appellant concludes NRCS did not follow the wetland delineation procedures when they used remote sensing, and therefore, their hydrology determination is erroneous.

However, paragraph 5-3(2)(i) of the National Engineering Handbook does not restrict the use of Chapter 19 tools only when they are contained in state offsite methods manual.  Paragraph 5-3(2)(i) states that in all circumstances NRCS may use Chapter 19 tools if objective criteria are contained in the state offsite methods manual.  This manual section does not limit the use of Chapter 19 tools to only those states with an offsite methods manual.  There is nothing in the paragraph prohibiting authorization of Chapter 19 tools by another authority.  This interpretation is consistent with paragraph 5-17 of the Food Security Act Wetland Identification Procedures.  (AR page 162)  "States are provided an option of developing and approving additional guidance to a Level-1 determination, as well as using any additional guidance currently in place.  This Level-1 additional guidance is referred to as State Offsite Methods or State Mapping Conventions."

Furthermore, 7 C.F.R. § 12.30(c) requires the Army Corps of Engineers, the Environmental Protection Agency, the U.S. Fish and Wildlife Service and NRCS to approve wetland delineation procedures.  In South Dakota, the required agencies have approved the SD Mapping Conventions.  (AR page 135)  Therefore, the procedures contained in the SD Mapping Conventions are appropriate for wetland determinations.  SD Mapping Conventions properly authorize the use of the Chapter 19 tool remote sensing when primary and secondary indicators are lacking.  Because NRCS could only identify one secondary indicator, they properly used remote sensing, in the hydrology determination.  Because NRCS found a wetland signature in 7 of 10 years with normal rainfall, NRCS properly concluded that Site 1 meets the hydrology requirement for a wetland.  (AR page 149)

Wetland Signature and Color Tone(CT)

Appellant argues that NRCS did not properly identify a wetland signature in 7 of the last 10 years of normal rainfall.  Appellant points out there are inconsistencies with the shading and the color tone between the different years and different photos.  (Appellant's Brief pages 22 – 25)  I note Appellant did not offer expert testimony at the hearing, nor did they take the opportunity to question the NRCS expert on any discrepancies they observed.  The testimony of the NRCS expert was undisputed at the evidentiary hearing.  NRCS also used remote sensing in their 2003 determination.  (FOF 18)  NRCS made the 2003 and 2010 determinations independently.  (FOF 5)  The fact that they both reached the same conclusion gives additional credibility to the NRCS determination.  I find the expert testimony of both NRCS witnesses more credible than Appellant's observations and analysis.

Appellant also argues that NRCS improperly used the abbreviation of color tone (CT) as an indicator of a wetland signature.  Appellant contends a finding of CT is insufficient for a finding

Foster Request for Review
001229

Arlen & Cindy Foster
Case No. 2011W000619

of inundation. (Appellant's Brief pages 18 – 19) Appellant cites the indicators of a wetland signature in SD Mapping Conventions, SD-LTR-33, which are listed on the previous page, and correctly notes that CT is not on the list of wetland signature indicators. Appellant concludes the hydrology determination is erroneous because NRCS used CT as a wetland signature indicator, and CT is not an indicator.

However, a change in color tone is indicative of several of the wetland signature characteristics in SD-LTR-33. NRCS would notice a change in color tone to identify wetland signature characteristics like saturated conditions, different planting dates for crops, and areas of greener vegetation. NRCS' use of CT as short hand for a wetland signature indicator does not invalidate the hydrology determination.

Appellant's water flow Analysis

Appellant argues the NRCS hydrology determination is erroneous because it is impossible for Site 1 to have the required duration of saturation or inundation of a Farmed Wetland pothole. Seven C.F.R. § 12.2 Wetland Determination (4)(ii) specifies the saturation/inundation requirement for a Farmed Wetland pothole. It requires ponding for "7 or more consecutive days" or saturated for "14 or more consecutive days" during the growing season in most years. Appellant contends that the pothole on Site 1 is not big enough to remain inundated or saturated for more than six days. Appellant calculated the rate at which the depression would drain when filled. Appellant determined even at the slowest rate water drains in Tetonka soil there would be less than six days of saturation or inundation. (Appellant's Brief page 27) Appellant argues that six days of saturation or inundation is not sufficient to support a finding of a farmed wetland pothole.

Appellant calculations are correct regarding how quickly the pothole drains. However, Appellant's analysis assumes the depression only fills up and drains once. If there were multiple periods of rainfall prior to the depression draining, it fills up again and requires an additional six days to drain. In other words, if it rains 2 times in 6 days causing the depression to refill, by Appellant's calculations it would take as many as 12 days to drain. If it rained 3 times in a 12-day period, it could take as long as 18 days to drain. Given Site 1 receives 21 - 23 inches of annual precipitation, and receives more than an inch of rain on average during May and June, it reasonable to conclude that during the growing season the pothole will fill and drain several consecutive times. (FOF 6 & 16) Therefore, Appellant's water flow analysis fails to negate the hydrology determination.

Appellant's Data

To further Appellant's assertion that there is insufficient water at Site 1 to meet the hydrology requirement, Appellant dug two holes about two feet deep and monitored the water levels in the holes during the 2010 growing season. One hole was within the boundary of Site 1 and one hole was outside the boundary. (AR 99 – 111) Based on their observations and analysis they conclude that the water levels were not high enough for a sufficient length of time to meet the hydrology requirement. Appellant made no claim of having any expertise in determining water

Foster Request for Review
001230

Arlen & Cindy Foster
Case No. 2011W000619

saturation or inundation, or in making wetland determinations. Appellant sited no regulation or authority for this procedure. Appellant stated that there were no measuring devices, like a piezometer, used to measure the water entering or leaving the holes. Appellant stated that there was no tubing or structure of any kind inside the holes and that it was "just dirt." (Appellant Testimony, HA Track 3, 00:33:08 – 00:33:52) While I appreciate Appellant's efforts to gather and collect additional data, the procedures used are not prescribed or authorized by any wetland delineation procedure. Therefore, this data is unreliable and not suitable for drawing conclusions about whether Site 1 is a wetland or not. The conclusions of the NRCS expert, based on procedures authorized by the SD Mapping Conventions are consistent with wetland delineation policy. Therefore, NRCS's conclusion that Site 1 meets the hydrology requirement is proper.

**Hydrophytic Vegetation**

Site 1 has a prevalence of hydrophytic vegetation. The rules provide that hydrophytic vegetation consist of plants growing in water or in a substrate that is at least periodically deficient in oxygen during a growing season because of excessive water content. A plant is hydrophytic if the National List of Plant Species that Occur in Wetland or a regional plant list approved by NRCS lists it. *See* 7 C.F.R. § 12.31 (b)(1) and NFSAM, Part 514.5 (C). If vegetation has been altered or removed, NRCS will determine if a prevalence of hydrophytic vegetation typically exists on this area by the use of a comparison site.

An appropriate comparison site must meet several requirements. Seven C.F.R. §12.31(b)(2)(ii) states that a comparison site must be "in the local area on the same hydric soil map unit under non-altered hydrologic conditions." In addition the 2010 Food Security Act Wetland Identification Procedures paragraph 5-70, states that when using the "comparison sites approach the comparison site should support hydrologic conditions that are similar to what existed on the altered site prior to the alteration." (AR page 170) Therefore, an appropriate comparison site will support similar hydrologic conditions, be in the local area, have the same hydric soil map unit and be unaltered.

The comparison site in this case meets these requirements. Appellant does not dispute that both sites have the same soil type (Tetonka) and the comparison site is unaltered. (FOF 32) Seven C.F.R. §12.31(b)(2)(ii) does not define the term "local area." NRCS testified it interprets "local area" to mean the same major land resource area, or MLRA. (Agency Testimony, HA Track 2, 01:30:38 – 01:32:01) Here, both sites are located in the same MLRA. (FOF 34) Finally, both sites have similar hydrology as identified by the NWI. One is seasonal and one is temporary. Seasonal and temporary wetlands have similar hydrologic conditions, as both lack water for part of the growing season. (FOF 33) Therefore, the comparison site meets the specified requirements and its use was appropriate.

In this case, NRCS properly determined a comparison site was appropriate because Site 1 was in agricultural production. NRCS chose a comparison site established in July 2000. In addition to meeting the specified requirements of a comparison site as discussed above, the comparison site shares other similarities with Site 1. The comparison site is a pothole and receives a similar amount of rainfall. (FOF 32 - 34) Based on the July 2000 analysis, the comparison site had a

11

Foster Request for Review
001231

Arlen & Cindy Foster
Case No. 2011W000619

prevalence index of 2.05. Any prevalence index of three or less indicates hydrophytic vegetation is prevalent on the site. Therefore, NRCS properly determined Site 1 met the hydrophytic vegetation requirement of a wetland.

Alternate Comparison Site

Appellant argues the comparison site is not an appropriate site for a number of reasons. First, they question NRCS' practice of using pre-established comparison sites. They also point out a number of differences between Site 1 and the comparison site. Finally, they argue a more appropriate site would be one located on their property.

Appellant argues wetland delineation procedures do not specifically authorize the use of predetermined comparison sites. However, Appellant cited no policy or provision that prohibits this practice. It seems a reasonable and cost effective way of making determinations when the comparison site meets the requirements in 7 C.F.R. § 12.2(b)(2)(ii). Because the comparison site meets theses requirements, its use was appropriate.

Appellant correctly points out there are differences between Site 1 and the comparison site. Specifically, Appellant notes that the Site 1 receives 21 – 23 inches of precipitation a year while the comparison site receives 23 – 25 inches of annual precipitation. (FOF 6 & 32) The comparison site is located more than 30 miles from Site 1, and has more primary and secondary indicators of hydrology. However, these differences do not prohibit the use of the comparison site in the vegetation determination. No two sites are identical and there will always be differences. Appellant has to show that the comparison site does not meet the requirements in 7 C.F.R. § 12.31(b)(2)(ii). Since there is no evidence to suggest that the comparison site does not meet the requirements, it use was appropriate.

Appellant felt a more appropriate comparison site would have been one on their property. They argue their proposed site is closer and therefore more representative of the types of local vegetation. When NRCS was making their determination in 2009, Appellant suggested two different locations in their pastureland. (Appellant Testimony, HA Track 3, 00:18:00 – 00:18:50) However, there was no evidence that the proposed sites had the same soil map unit or that they supported similar hydrologic conditions. Therefore, Appellant has not shown their proposed sites are more appropriate or the comparison site to be inappropriate.

Summary

In summary, I find that NRCS properly considered all three factors (hydric soils, hydrophytic vegetation and hydrology) in determining that Site 1 is a wetland.

**2. Was NRCS' onsite visit in November sufficient to make a proper wetland determination?**

Appellant argues that the November site visit was not appropriate because it was not during the growing season. Appellant reasons that given the 30 plus months the determination request was

12

Foster Request for Review
001232

Arlen & Cindy Foster
Case No. 2011W000619

pending, there was adequate opportunity to visit the site when conditions would be optimal. Appellant cites 7 C.F.R § 12.6(c)(7) in arguing that the onsite visit must be made when "conditions are favorable for making an evaluation of soils, hydrology or vegetation." (Appellant' Brief page 19)

NRCS interprets 7 C.F.R. § 12.6 (c)(7) differently.  It argues this directive does not mandate the time of year required for a site visit.  Because NRCS uses an indicator-based approach to wetland determinations, a site visit during the growing season is not required.  Part IV of the Food Security Act Wetland Identification Procedures states that the indicator-based approach allows the Agency to make sound decisions, regardless of the timing of the field visit.  (AR pages 158 -160)  Paragraphs 4-2, 4-3 and 5-4 recognizes NRCS may not always make the onsite visit in optimum conditions, and onsite visits are not always related to collecting wetland indicator data.  There are many reasons an onsite visit is required after an appeal or before the withholding of benefits.  *See* 16 U.S.C. § 3822(a)(5) & (c). The onsite visit requirement does not require NRCS to base all indicators on data collected directly from the site.  It is a requirement that NRCS make a trip to the site.  In some cases, NRCS may visit a site to get additional information about present or future manipulation plans.  It may have nothing to do with the wetland indicators or the data used to make the determination.  *See* paragraph 5-4 of the FSA Wetland Identification Procedures AR page 160.  Because the onsite visit requirement is not required to be during the growing season, NRCS' November 2010 onsite visit was appropriate.

Finally, Appellant argues that because NRCS made previous site visits May, it should use the data collected from the previous determinations in 2003 and 2009.  Appellant indicates that it was an error to exclude these determinations from the record.  (Appellant's brief page 25 & 26)  NRCS conducted the 2010 determination independent from the previous determinations.  (FOF 4 & 5)  Both the 2009 and 2003 determinations indicated Site 1 was a wetland.  NRCS' independent determination in 2010 is consistent with these results, but does not rely on the data in its conclusion.  The findings of all the previous determinations corroborate the results in 2010.

3. **Did NRCS properly determine Site 1 is not an artificial wetland?**

Appellant suggests the best explanation for any of the wetland characteristics found at Site 1 is the snowmelt from the shelterbelt and that Site 1 is an artificial wetland.  Seven C.F.R. § 12.2 Wetland Determination (1) defines artificial wetland as an area that was formerly non-wetland, but now meets wetland criteria due to human activities.  The shelterbelt was planted in 1936 as a windbreak.  (FOF 10)  Each winter anywhere from 4 – 10 feet of snow accumulates in the shelterbelt.  (FOF 10)  This snow takes about 30 days longer to melt than snow in the field and the snowmelt drains into Site 1.  (FOF 10)  Appellant argues the human activity of planting the shelterbelt resulted in the snow accumulating at the edge of the field and additional water draining into Site 1.  Therefore, they conclude the proper classification of Site 1 is an artificial wetland.

However, Appellant's analysis is inconsistent with the soil data collected.  The soil outside of Site 1 is not hydric.  (FOF 20 & 21)  If the draining snowmelt was the cause of the hydric soils at Site 1, then the soil between the shelterbelt and Site 1 should also be hydric.  However, even the

13

Foster Request for Review
001233

Arlen & Cindy Foster
Case No. 2011W000619

soil next to the shelterbelt is an upland soil and not hydric. (FOF 28) Additionally, the presence of the argillic horizon found only in the hydric soils of Site 1 indicates the necessary hydrologic conditions were present long before the shelterbelt existed. (FOF 24 & 25) Furthermore, Appellant documented ponding at Site 1 in September 2010, long after the snow melted, and before any significant snow could accumulate in the shelterbelt. (AR pages 110 – 111) This demonstrates the snowmelt is not the only source of water draining into Site 1. Because snowmelt is not the only source of water draining into Site 1, hydric soils only exist within the boundary of Site 1, and the argillic horizon began forming long before the shelterbelt existed, NRCS properly determined that Site 1 is not an artificial wetland.


## DETERMINATION

Seven C.F.R. § 11.8(e) provides that an appellant bears the burden of proving that an agency's adverse decision is erroneous by a preponderance of the evidence. In this case, Appellant did not meet this burden. The Agency decision is not erroneous.

This is a final determination of the Department of Agriculture unless a party a timely requests a review.

Dated and mailed this 10th day of January 2012.


_____/s/_____
**Chris Barley**
Hearing Officer
National Appeals Division

Attachments:
Notice of Right to Request Director Review and/or Copy of Audio Recording
Request for Director Review

Foster Request for Review
001234

Arlen & Cindy Foster
Case No. 2011W000619


Distribution of copies:

APPELLANT:
Arlen Foster
Cindy Foster
24314 421st Ave
Fulton, SD 57340

APPELLANT' REPRESENTATIVE:
Thomas A Lawler
Attorney at Law
601 Coates St
PO Box 280
Parkersburg, IA 50665

AGENCY
An electronic notice and copy of this Appeal Determination sent from the National Appeals
Division to NRCS at ProgramAppeals@wdc.usda.gov. The mailing address for the NRCS
Appeals and Equitable Relief Specialist is:
NRCS Appeals and Equitable Relief Specialist
c/o Strategic Planning and Evaluation Division
14th and Independence Avenue, SW, Room 5206-S
Washington, DC  20250

Foster Request for Review
001235

## NOTICE OF RIGHT TO REQUEST DIRECTOR REVIEW AND/OR COPY OF AUDIO RECORD

**DIRECTOR REVIEW REQUEST**

Either party may request that the Director of the National Appeals Division (NAD) review this determination. A suggested format is attached, but any request is acceptable if it has all the information in the "Instructions for Request for Review" listed below.

**An appellant or third party** who believes that this determination is wrong must file a request for Director review within **30 days** of receipt of this determination. Unless appropriate documentation shows otherwise, the Director presumes that it usually takes 7 days for a determination to reach an appellant by mail. However, the Director will accept requests filed more than 37 days from the date of the determination if the person shows that receipt of the determination took longer than usual. A request must be in writing and be signed by the appellant or third party. A request must also follow the "Instructions for Request for Review" listed below.

**The agency** may also file a request for Director review if it believes this determination is wrong. The agency must file its request within **15 business days** of receipt of this determination. The head of the agency or someone acting in that capacity must sign the request. The agency must also follow the "Instructions for Request for Review" listed below.

Parties may file written responses to a request for Director review within **5 business days** of receipt of a copy of the request for review.

The date a document is considered "filed" is either the date it is delivered in writing to NAD, its postmark date, or the date that a complete facsimile copy is received by NAD.

### Instructions for Requests for Review

A request for review must include the following information:

- be personally signed and dated by appellant, third party or head of the agency;
- specifically request a review;
- give the case number for the Hearing Officer determination (the case number is on the top right-hand side of the first page of the determination);
- note the date the requester received the Hearing Officer determination;
- say why the determination is wrong;
- confirm that the requester has also sent a copy of the request and additional information, if any, to the other party at the same time that the request was sent to NAD; and
- be mailed, faxed or delivered by commercial delivery service to:

Foster Request for Review
001236

Arlen & Cindy Foster
Case No. 2011W000619

National Appeals Division
Western Regional Office
**755 Parfet St. Suite 494**
**Lakewood, Colorado 80215-5599**
**(303) 236-2820 Fax**
**(800) 541-0483 Phone**
**(800) 497-0253 TDD**

**COPY OF AUDIO RECORD REQUEST**

The appellant(s), third parties, and the agency may obtain a copy of the audio record made of the pre-hearing/hearing proceedings at no cost.  Copies may be obtained by making a written request to the NAD Regional Office.

Foster Request for Review
001237

Arlen & Cindy Foster
Case No. 2011W000619

## REQUEST FOR DIRECTOR REVIEW

I/We, *(print name(s))* _____, am/are the Appellant(s)/Third Party/Agency head in the above-referenced appeal and I/we request a Director review of the appeal determination in this case.

The case number is: _____.

I/We received the appeal determination on _____.

The specific reasons why I/we believe the appeal determination is wrong are: (The requester may attach additional sheets and documents, if desired.)

A copy of this request, along with any attachments, was mailed to the other parties on _____.

I swear that all statements in this filing are true to the best of my knowledge and belief.

_____        _____

**Appellant(s)/Third Party/Agency head signature(s)**          **Date**

Foster Request for Review
001238

## DIRECTOR REVIEW DETERMINATION

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| | ) | |
| ARLEN FOSTER | ) | Case No. 2011W000619 |
| CINDY FOSTER | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NATURAL RESOURCES | ) | |
| CONSERVATION SERVICE | ) | |

On February 13, 2012, Arlen and Cindy Foster (Appellants) filed a request for Director review of a National Appeals Division (NAD) Hearing Officer Appeal Determination issued on January 10, 2012. The Hearing Officer determined that the Natural Resources Conservation Service (NRCS or Agency) adverse decision, dated June 23, 2011, was not erroneous. In the adverse decision, NRCS determined that Appellants' land contained 0.8 acres of wetland.

I uphold the Hearing Officer's determination as I have concluded upon Director review that it is supported by substantial evidence in the record and that the adverse decision is consistent with applicable regulations. In arriving at this decision, I have reviewed the applicable laws and regulations; the case record, including the hearing testimony and the Hearing Officer's determination; Appellants' request for Director review; and NRCS's response to Appellants' request for Director review.

### Issue in This Case

The dispute in this case is whether NRCS followed appropriate procedures when it determined that Appellants' farm contained 0.8 acres of wetland. To resolve this dispute, I must determine whether the area in question (a) has a predominance of hydric soils, (b) is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions, and (c) under normal circumstances does support a prevalence of hydrophytic vegetation.

### Background

On July 23, 2008, Appellants requested a wetland determination by completing FSA Form AD-1062. File 4, Tab 15, Agency Record, Page 33. NRCS issued a certified wetland determination on December 4, 2009, but rescinded the determination on January

Foster Request for Review
001239

Arlen and Cindy Foster                                                                    2
Case No. 2011W000619

15, 2010. NRCS reevaluated Appellants' farm on November 23, 2010, and it issued a
certified wetland determination on June 23, 2011 (i.e., the adverse decision). File 4, Tab
15, Agency Record, Page 41. In its adverse decision, Agency determined that a 0.8-acre
area of Appellants' farm (the Pothole) was a wetland. File 1, Tab 1.

In making its wetland determination, Agency reviewed the soil survey, in which Agency
mapped the Clarno-Stickney-Tetonka complex in the area. Tetonka is on the county's
hydric soils list, and it is listed as pothole soil. File 3, Tab 5, Hearing Testimony, Pages
23 and 28–30. Agency reviewed prior determinations and did not find any manipulations
prior to 1985. File 3, Tab 5, Hearing Testimony, Pages 23–24. Agency reviewed the
national wetland inventory map, which revealed that the site is in a pothole region with
many small depressions in the area and that the area is an emergent wetland. File 3, Tab
5, Hearing Testimony, Pages 25–27. After considering such information, Agency
identified the site as a potential wetland.

Agency then conducted an on-site inspection. Agency took eight samples from the
Pothole, and all eight samples exhibited indicators of hydric soils. File 3, Tab 5, Hearing
Testimony, Page 76; *see generally* File 3, Tab 5, Hearing Testimony, Pages 70–88; *see
also* File 4, Tab 15, Agency Record, Pages 52–62.

When NRCS conducted the on-site inspection of the Pothole, NRCS determined that
normal environmental conditions were not present because it had been drier than normal,
and NRCS proceeded to analyze the Pothole as a "problem area" under Part IV, Section
G of the 1987 Army Corps of Engineers Wetlands Delineation Manual (Corps Manual).
File 3, Tab 7, Hearing Testimony, Pages 25, 29–32, and 43–49. NRCS determined that
the Pothole was a concave depression, which was conducive for collecting water. File 3,
Tab 5, Hearing Testimony, Pages 35 and 42–43

NRCS proceeded to analyze multiple years of aerial photography. File 3, Tab 5, Hearing
Testimony, Page 49. NRCS examined the last twenty years of aerial photography and
determined that ten photos were taken in years with normal rainfall. File 3, Tab 5,
Hearing Testimony, Pages 49–55; *see* File 4, Tab 15, Agency Record, Pages 84–93. Of
the ten normal-year photographs, NRCS observed wetness signatures in seven. File 3,
Tab 5, Hearing Testimony, Pages 55–56; *see* File 4, Tab 15, Agency Record, Pages 87–
88. Because NRCS observed wetness signatures on photos in more than half of the years
included in the analysis, NRCS determined that wetland hydrology was present at the
Pothole. *See* Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Pages
446–447; *see also* File 4, Tab 15, Agency Record, Page 149 (SD-LTP-33).

NRCS determined that indicators of hydrology were problematic because the Pothole
temporarily lacked hydrology due to dry conditions. File 3, Tab 5, Hearing Testimony,
Pages 44–49; *see* File 4, Tab 15, Agency Record, Pages 72–83. Thus, NRCS evaluated
problematic vegetation by determining whether hydrophytic vegetation typically exists in
the local area on the same hydric soil map unit under non-altered hydrologic conditions.

Foster Request for Review
001240

Arlen and Cindy Foster                                                    3
Case No. 2011W000619

File 3, Tab 5, Hearing Testimony, Pages 99–110; Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Pages 426 and 432. NRCS determined that the vegetation had been disturbed or altered by Appellants' farming operation, making the remaining vegetation insufficient or unreliable for making a hydrophytic vegetation determination. File 3, Tab 5, Hearing Testimony, Pages 99 and 102. Thus, NRCS used a reference site, located approximately 30 or 40 miles from the Pothole, to make its hydrophytic vegetation determination. File 3, Tab 5, Hearing Testimony, Pages 99 and 102.

NRCS selected a reference site that was included in the same Tetonka hydric soil map unit and was in the same major land use area, which Agency defined as the "local area on the same hydric soil map unit" within the meaning of 7 C.F.R. § 12.31(b)(2)(ii). *See* File 3, Tab 5, Hearing Testimony, Pages 107–108. The hydrophytic vegetation sampling on the reference site was conducted in July 2000, and the reference site is still currently preserved grassland (i.e., it is minimally disturbed and provides long-term access). *See* File 3, Tab 5, Hearing Testimony, Page 105; *see also* File 7, Tab 15, Agency Record, Pages 655–662. The reference site is a prairie pothole similar to the Pothole. *See* File 3, Tab 5, Hearing Testimony, Page 108. The precipitation is similar between the reference site and the Pothole, and both sites had similar hydrologic regimes. File 3, Tab 5, Hearing Testimony, Page 109.

The reference site was a wetland and met all criteria, including the predominance of hydrophytic vegetation under normal circumstances. File 7, Tab 15, Agency Record, Pages 655–667; *see* File 3, Tab 5, Hearing Testimony, Pages 104–111. Because the reference site exhibited the necessary indicators of hydrophytic vegetation, the Pothole was considered to have the same plant community absent human interference. *See, e.g.,* File 4, Tab 15, Agency Record, Pages 43 and 46; *see also* File 6, Tab 15, Agency Record, Page 432. Therefore, NRCS concluded the Pothole would support a prevalence of hydrophytic vegetation under normal circumstances. File 3, Tab 5, Hearing Testimony, Page 110.

Having found that the Pothole exhibited all three criteria necessary to label the Pothole a wetland, NRCS issued a certified wetland determination on June 23, 2011. File 1, Tab 1. On August 12, 2011, Appellants filed an appeal with NAD. File 1, Tab 2. On October 18, 2011, the Hearing Officer conducted an in-person hearing to resolve the issues raised on appeal. File 1, Tab 4. After considering arguments and evidence on appeal, the Hearing Officer issued an Appeal Determination upholding NRCS's adverse decision. File 1, Tab 7. On February 13, 2012, Appellants filed a request for Director review of the Hearing Officer Appeal Determination issued on January 10, 2012. File 1, Tab 8. NRCS filed a response to the request for Director review. File 1, Tab 9.

## Legal Standards

The "Swampbuster" (i.e., Wetland Conservation) provisions of the Food Security Act (16 U.S.C. § 3801 and §§ 3821–3824), as amended, contain the statutes applicable to this

Foster Request for Review
001241

Arlen and Cindy Foster                                                    4
Case No. 2011W000619

case. *See generally Clark v. USDA*, 492 F. Supp. 2d 1085 (S.D. Iowa 2007). Part 11 and
Part 12 of Title 7 of the Code of Federal Regulations (C.F.R.) contain the regulations
applicable to this case. The 2010 Food Security Act Wetland Identification Procedures
outline the current wetland delineation methodology used by NRCS. *See* National Food
Security Act Manual Part 527, Appx., Circular No. 6; 2010 Food Security Act Wetland
Identification Procedures; File 4, Tab 15, Agency Record, Pages 150–171. Except as
varied by the 2010 Food Security Act Wetland Identification Procedures, Part IV of the
Corps Manual and the approved Corps regional supplements comprise the foundation of
wetland identification procedures under the Act. *See* National Food Security Act Manual
Part 527, Appx., Circular No. 6; 2010 Food Security Act Wetland Identification
Procedures; File 4, Tab 15, Agency Record, Pages 150, 154, and 159. Version 2.0 of the
Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Great
Plains Region (Regional Supplement) contains information on evaluating difficult
wetland situations in the Great Plains region. *See* Regional Supplement, Chapter 5; File
6, Tab 15, Agency Record, Pages 424–467. In addition to the offsite procedures provided
in the Corps Manual and Regional Supplement, states have the option of utilizing state
mapping conventions or state offsite methods. Food Security Act Manual Part 527,
Appx., Circular No. 6; 2010 Food Security Act Wetland Identification Procedures; File 4,
Tab 15, Agency Record, Page 154.

Under the Food Security Act, any person who produces an agricultural commodity on
highly erodible land or designates such land for conservation use, plants an agricultural
commodity on a converted wetland, or converts a wetland shall be determined to be
ineligible for certain benefits provided by the United States Department of Agriculture
(USDA) and agencies and instrumentalities of USDA. 7 C.F.R. § 12.1(a); *see* 7 C.F.R. §
12.4; 16 U.S.C. § 3821(a)(2). The term "wetland" means land that (a) has a
predominance of hydric soils, (b) is inundated or saturated by surface or groundwater at a
frequency and duration sufficient to support a prevalence of hydrophytic vegetation
typically adapted for life in saturated soil conditions, and (c) under normal circumstances
does support a prevalence of hydrophytic vegetation. 16 U.S.C. § 3801(a)(27); 7 C.F.R.
§ 12.2(a) (definition of wetland).

NRCS is charged with making or approving wetland determinations, delineations, and
certifications. 7 C.F.R. § 12.30(a)(3). NRCS has the sole responsibility to make wetland
determinations and delineations for USDA program eligibility. *See* NRCS Circular No.
6, Part 527, Appendix; File 4, Tab 15, Agency Record, Page 150; *see also* 7 C.F.R. §
12.30(a)(3) and (6). A "wetland determination" is a decision regarding whether an area is
a wetland, including identification of wetland type and size. 7 C.F.R. § 12.2(a)
(definition of wetland determination). Under Part IV of the Corps Manual, if NRCS
conducts a routine wetland determination and discovers that sufficient information is
available to make a wetland determination, then an on-site inspection is unnecessary.
Corps Manual, Part IV, Section D, Subsection 1; File 5, Tab 15, Agency Record, Pages
227–228. However, if available information is insufficient to make a determination, then

Foster Request for Review
001242

Arlen and Cindy Foster                                                            5
Case No. 2011W000619

on on-site inspection is required.  Corps Manual, Part IV, Section D, Subsection 1; File 5, Tab 15, Page 231.

### *Predominance of Hydric Soils*

First, when making its wetland determination, NRCS must determine whether an area of a field or other parcel of land has a predominance of hydric soils. 16 U.S.C. § 3801(a)(27); 7 C.F.R. § 12.31(a)(2). The term "hydric soil" means soil that, in its undrained condition, is saturated, flooded, or ponded long enough during a growing season to develop an anaerobic condition that supports the growth and regeneration of hydrophytic vegetation. 16 U.S.C. § 3801(a)(12); *see also* 7 C.F.R. § 12.2(a) (definition of hydric soils). The Secretary of USDA has developed criteria for the identification of hydric soils and has developed lists of such soils. *See* 16 U.S.C. § 3801(b). NRCS identifies hydric soils through the use of published soil maps that reflect soil surveys completed by NRCS or through the use of on-site reviews. 7 C.F.R. § 12.31(a)(1); *see* 7 C.F.R. § 12.30(a)(1). If a soil map unit has hydric soil as all or part of its name, that soil map unit or portion of the map unit related to the hydric soil shall be determined to have a predominance of hydric soils. 7 C.F.R. § 12.31(a)(2)(i). If a soil map unit includes hydric soils, that portion of the soil map unit identified as hydric soil shall be determined to have a predominance of hydric soils. 7 C.F.R. § 12.31(a)(2)(iii). The local NRCS office must maintain and make available an official list of hydric soil map units, including a list of nationally-recognized hydric soils in the area and any soil map units or areas that the state conservationist determines meet certain criteria. *See* 7 C.F.R. § 12.31(a)(3)(ii).

### *Wetland Hydrology*

Second, NRCS must determine whether an area of a field or other parcel of land is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions. *See generally* 7 C.F.R. § 12.31(b); *see also* 16 U.S.C. § 3801(a)(27). NRCS refers to this determination as "wetland hydrology." National Food Security Act Manual Part 514.6; File 7, Tab 15, Agency Record, Page 606.

Wetland hydrology determinations are based on indicators, many of which are designed to be used during dry periods when the direct observation of surface water or a shallow water table is not possible. However, some wetlands may lack any of the listed hydrology indicators, particularly during the dry season or in a dry year. The evaluation of wetland hydrology requires special care on any site where indicators of hydrophytic vegetation and hydric soil are present but hydrology indicators appear to be absent. Among other factors, this evaluation should consider the timing of the site visit in relation to normal seasonal and annual hydrologic variability and whether the amount of rainfall prior to the site visit has been normal. Much of the Great Plains region is characterized by long, hot summer dry seasons. During the dry season, surface water

Foster Request for Review
001243

Arlen and Cindy Foster                                                                6
Case No. 2011W000619

recedes from wetland margins, water tables drop, and many wetlands dry out completely. Superimposed on this seasonal cycle is a long-term pattern of multi-year droughts alternating with years of higher-than-average rainfall. Wetlands in general are inundated or saturated in most years (at least five years in ten, or fifty percent or higher probability) over a long-term record. However, some wetlands in the Great Plains do not become inundated or saturated in some years and, during drought cycles, may not inundate or saturate for several years in a row. Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Page 442. Some wetlands can be difficult to identify because wetland indicators may be missing due to natural processes or recent disturbances. Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Page 424.

When conducting the on-site inspection of an area less than five acres, if NRCS determines that normal environmental conditions are not present, then NRCS may proceed to analyze the area as a "problem area" under Part IV, Section G. Corps Manual, Part IV, Section D, Subsection 2; File 5, Tab 15, Agency Record, Pages 231–237. Section G specifically identifies "prairie potholes" as problem areas. Prairie potholes normally occur as shallow depressions in glaciated portions of the north-central United States. Many are landlocked, while others have a drainage outlet to streams or other potholes. Most have standing water for much of the growing season in years of normal or above normal precipitation but are neither inundated nor have saturated soils during most of the growing season in years of below normal precipitation. During dry years, potholes often become incorporated into farming plans and are either planted to row crops or are mowed as part of a haying operation. When this occurs, wetland indicators of one or more parameters may be lacking. For example, tillage would eliminate any onsite hydrologic indicator and would make detection of soil and vegetation indicators much more difficult. Corps Manual, Part IV, Section G; File 5, Tab 15, Agency Record, Pages 267.

In order to evaluate wetland hydrology where hydrology indicators appear to be absent, NRCS must (1) verify that indicators of hydrophytic vegetation and hydric soil are present or are absent due to disturbance or other problem situations; (2) verify that the site is in a landscape position that is likely to collect or concentrate water (e.g., concave surface such as a depression or swale); and (3) use one or more of the following approaches to determine whether wetland hydrology is present and the site is a wetland: (a) determine whether the site visit occurred during the normal annual "dry season," (b) determine if this is a period with below-normal rainfall, (c) determine whether the area has been subject to drought, (d) if indicators of hydric soil and hydrophytic vegetation are present on a site that lacks wetland hydrology indicators, the site may be considered to be a wetland if the landscape setting, topography, soils, and vegetation are substantially the same as those on nearby wetland reference areas, (e) "Hydrology Tools" is a collection of methods that can be used to determine whether wetland hydrology is present on a potential wetland site that lacks indicators due to disturbance or other reasons, particularly on lands used for agriculture, (f) evaluating multiple years of aerial

Foster Request for Review
001244

Arlen and Cindy Foster
Case No. 2011W000619

7

photography, or (g) long-term hydrologic monitoring.  Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Pages 442–448.

Each year, the Farm Service Agency (FSA) takes low-level aerial photographs in agricultural areas to monitor the acreages planted in various crops for USDA programs. NRCS has developed an off-site procedure that uses these photos, or repeated aerial photography from other sources, to make wetland hydrology determinations.  If wetness signatures are observed on photos in more than half of the years included in the analysis, then wetland hydrology is present.  Wetness signatures for a particular state may include surface water, saturated soils, flooded or drowned-out crops, stressed crops due to wetness, differences in vegetation patterns due to different planting dates, inclusion of wet areas into set-aside programs, unharvested crops, isolated areas that are not farmed with the rest of the field, patches of greener vegetation during dry periods, and other evidence of wet conditions.  Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Pages 446–447; *see also* File 4, Tab 15, Agency Record, Page 149 (SD-LTP-33).

*Hydrophytic Vegetation*

Finally, when making its wetland determination, NRCS must determine whether such area or parcel would support a prevalence of hydrophytic vegetation under normal circumstances.  *See generally* 7 C.F.R. § 12.31(b); *see also* 16 U.S.C. § 3801(a)(27).  The term "hydrophytic vegetation" means a plant growing in water, or plants growing in a substrate that is at least periodically deficient in oxygen during a growing season as a result of excessive water content.  16 U.S.C. § 3801(a)(13); 7 C.F.R. § 12.2(a) (definition of hydrophytic vegetation); *see also* 7 C.F.R. § 12.31(b).  The term "normal circumstances" refers to the soil and hydrologic conditions that are normally present, without regard to whether the vegetation has been removed.  7 C.F.R. § 12.31(b)(2)(i). NRCS must determine the prevalence of hydrophytic vegetation in accordance with the current Federal wetland delineation methodology in use by NRCS at the time of the determination (i.e., the Corps Manual and Regional Supplement).  7 C.F.R. § 12.31(b)(3). The Secretary of USDA has developed criteria for the identification of hydrophytic vegetation and has developed lists of such vegetation.  *See* 16 U.S.C. § 3801(b); *see* File 6, Tab 15, Agency Record, Pages 516–588.

Many factors affect the structure and composition of plant communities in the Great Plains, including climatic variability, long-term grazing, fires, groundwater withdrawal, and other human land-use practices.  As a result, some wetlands may exhibit indicators of hydric soil and wetland hydrology but lack any of the hydrophytic vegetation indicators, at least at certain times.  To identify and delineate these wetlands may require special procedures or additional analysis of factors affecting the site, including recent changes in hydrologic conditions that may not be reflected in the current vegetation on a site.  To the extent possible, the hydrophytic vegetation decision should be based on the plant community that is normally present during the wet portion of the growing season in a

Foster Request for Review
001245

Arlen and Cindy Foster                                                                 8
Case No. 2011W000619

normal rainfall year.  Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Page 425.

When evaluating problematic hydrophytic vegetation, NRCS recommends the following procedures:  First, NRCS should verify that at least one indicator of hydric soil and one primary or two secondary indicators of wetland hydrology are present.  Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Page 425; see File 4, Tab 15, Agency Record, Pages 147–148 (for local primary and secondary hydrology indicators). If indicators of either hydric soil or wetland hydrology are absent, the area is likely nonwetland, unless soil or hydrology are also disturbed or problematic.  If indicators of hydric soil and wetland hydrology are present (or are absent due to disturbance or other problem situations), then NRCS should verify that the area is in a landscape position that is likely to collect or concentrate water (e.g., concave depression or swale).  Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Page 425.  Next, NRCS may use one or more approaches to determine whether vegetation is hydrophytic, including the approach for areas that have been altered and are managed to meet human goals. Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Pages 426 and 432.

Many natural plant communities throughout the Great Plains have been altered and are managed to meet human goals.  Examples include clearing of woody vegetation on rangelands, periodic disking or plowing, mowing, planting of native and non-native species (including cultivars or planted species that have escaped and become established on other sites), irrigation of pastures and hayfields, suppression of wildfires, and the use of herbicides.  These actions can result in elimination of certain species and their replacement with other species, changes in abundance of certain plants, and shifts in dominant species, possibly influencing a hydrophytic vegetation determination.  Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Page 432.

In the event vegetation has been altered or removed, NRCS must determine if a prevalence of hydrophytic vegetation typically exists in the local area on the same hydric soil map unit under non-altered hydrologic conditions.  7 C.F.R. § 12.31(b)(2)(ii).  If the natural vegetation has been altered through management to such an extent that a hydrophytic vegetation determination may be unreliable, NRCS may (1) examine the vegetation on a nearby, unmanaged reference site having similar soils and hydrologic conditions (and assume that the same plant community would exist on the managed site in the absence of human alteration); (2) for recently cleared or plowed areas (not planted or seeded), leave representative areas unmanaged for at least one growing season with normal rainfall and reevaluate the vegetation; (3) if management was initiated recently, use off-site data sources such as aerial photography, national wetland inventory maps, and interviews with the land owner and other persons familiar with the site or area to determine the plant community present on the site before the management occurred; (4) if the unmanaged vegetation condition cannot be determined, make the wetland determination based on indicators of hydric soil and wetland hydrology.  Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Page 432.

Foster Request for Review
001246

Arlen and Cindy Foster
Case No. 2011W000619

.    9

Regarding reference sites, if indicators of hydric soil and wetland hydrology are present at the primary site, the primary site may be considered to be a wetland if the landscape setting, topography, soils, and vegetation are substantially the same as those on nearby wetland reference sites. Hydrologic characteristics of wetland reference sites should be documented by application of direct hydrologic observations. Reference sites should be minimally disturbed and provide long-term access. Soils, vegetation, and hydrologic conditions should be thoroughly documented and the data kept on file in the district or field office. Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Page 434; *see* File 4, Tab 15, Agency Record, Page 170; *see also* 7 C.F.R. § 12.31(b)(2).

*Appeal to NAD*

A program participant that receives an adverse decision from an agency may appeal to NAD. 7 U.S.C. § 6996(a); 7 C.F.R. § 11.6(b). A wetland determination is an adverse decision. *See* 7 C.F.R. § 11.1 (definition of adverse decision). On appeal to NAD, an appellant bears the burden of proving by a preponderance of the evidence that the adverse decision of the agency was erroneous. 7 C.F.R. § 11.8(e); *see* 7 U.S.C. § 6997(c)(4). On Director review, an appellant must state specific reasons why the appellant believes the Hearing Officer's determination was incorrect. 7 C.F.R. § 11.9(a).

## Analysis

On Director review, Appellants dispute NRCS's determination that the Pothole was inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions (i.e., NRCS's wetland hydrology determination). Appellants argue that NRCS failed to provide substantial evidence upon which the Hearing Officer could base his conclusion that the aerial photographs NRCS reviewed showed wetness signatures in seven of the ten years. *See* File 1, Tab 8.

On Director review, Appellants also argue that the reference site used to determine hydrophytic vegetation was not in the "local area" within the meaning of 7 C.F.R. § 12.31(b)(2)(ii). Appellants estimated that the reference site was approximately forty miles away from the Pothole. *See* File 1, Tab 8.

While Appellants raise other arguments on review, the arguments either address the wrong standard of review or do not show by preponderance of the evidence that the adverse decision was erroneous. Therefore, I will only address the material arguments previously mentioned.

The dispute in this case is whether NRCS followed appropriate procedures when it determined that Appellants' land contained 0.8 acres of wetland. To resolve this dispute, I must determine whether the area in question (a) has a predominance of hydric soils, (b)

Foster Request for Review 001247

Arlen and Cindy Foster                                                                10
Case No. 2011W000619

is inundated or saturated by surface or groundwater at a frequency and duration sufficient
to support a prevalence of hydrophytic vegetation typically adapted for life in saturated
soil conditions, and (c) under normal circumstances supports a prevalence of hydrophytic
vegetation. For the reasons outlined below, I uphold the Hearing Officer's determination.
I have concluded upon Director review that the Hearing Officer Appeal Determination is
supported by substantial evidence in the record and that NRCS's adverse decision is
consistent with applicable regulations.

### *Predominance of Hydric Soils*

I conclude that substantial evidence in the record supports the Hearing Officer's finding
that the Pothole has a predominance of hydric soils. On Director review, Appellants do
not challenge Agency's finding that the Pothole has a predominance of hydric soils.
Therefore, I briefly discuss this prong of the wetland criteria. *See* 7 C.F.R. § 11.9(a).

Agency determined that the Pothole has a predominance of hydric soils. In doing so,
Agency followed the five basic steps necessary to make a preliminary determination, as
outlined in the local mapping conventions, including (1) reviewing the soil survey, (2)
reviewing prior determinations, (3) reviewing national wetland inventory maps, (4)
determining if prior manipulations had occurred, and (5) reviewing other evidence of a
potential wetland. File 3, Tab 5, Hearing Testimony, Pages 23–30. Agency reviewed the
soil survey, in which Agency has mapped the Clarno-Stickney-Tetonka complex in the
area. Tetonka is on the county's hydric soils list, and it is listed as pothole soil. File 3,
Tab 5, Hearing Testimony, Page 23 and 28–30. Agency reviewed prior determinations
and did not find any manipulations prior to 1985. File 3, Tab 5, Hearing Testimony,
Pages 23–24. Agency reviewed the national wetland inventory map, which revealed that
the site is in a pothole region with many small depressions in the area and that the area is
an emergent wetland. File 3, Tab 5, Hearing Testimony, Pages 25–27. After considering
such information, Agency identified the site as a potential wetland.

Agency then conducted an on-site inspection. Agency took eight samples from the
Pothole, and all samples exhibited indicators of hydric soils. File 3, Tab 5, Hearing
Testimony, Page 76; *see generally* File 3, Tab 5, Hearing Testimony, Pages 70–88; *see
also* File 4, Tab 15, Agency Record, Pages 52–62. Therefore, I conclude that Agency
followed applicable regulations and that substantial evidence supports the Hearing
Officer's finding that the Pothole has a predominance of hydric soils and meets the first
criterion for identification of a wetland. *See* 16 U.S.C. § 3801(a)(27); 7 C.F.R. § 12.2(a)
(definition of wetland).

### *Inundation or Saturation Supporting Hydrophytic Vegetation (i.e., Wetland Hydrology)*

On Director review, Appellants' dispute NRCS's determination that the Pothole was
inundated or saturated by surface or groundwater at a frequency and duration sufficient to
support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil

Foster Request for Review
001248

Arlen and Cindy Foster
Case No. 2011W000619

11

conditions (i.e., NRCS's wetland hydrology determination). Appellants argue that NRCS failed to provide substantial evidence upon which the Hearing Officer could base his conclusion that the aerial photographs NRCS reviewed showed wetness signatures in seven of the ten years. *See* File 1, Tab 8.

In making its routine wetland determination, NRCS discovered that insufficient information was available to make a determination without an on-site inspection. *See* File 3, Tab 7, Hearing Testimony, Pages 23–41. Thus, an on-site inspection was required. Corps Manual, Part IV, Section D, Subsection 1; File 5, Tab 15, Agency Record, Page 231.

When NRCS conducted the on-site inspection of the Pothole, NRCS determined that normal environmental conditions were not present because it had been drier than normal, and NRCS proceeded to analyze the Pothole as a "problem area" under Part IV, Section G of the Corps Manual. File 3, Tab 7, Hearing Testimony, Pages 25, 29–32, and 43–49; *see* Manual, Part IV, Section D, Subsection 2; File 5, Tab 15, Agency Record, Pages 231–237. Section G specifically identifies "prairie potholes" as problem areas. Prairie potholes normally occur as shallow depressions in glaciated portions of the north-central United States. Many are landlocked, while others have a drainage outlet to streams or other potholes. Most have standing water for much of the growing season in years of normal or above normal precipitation but are neither inundated nor have saturated soils during most of the growing season in years of below normal precipitation. During dry years, potholes often become incorporated into farming plans and are either planted to row crops or are mowed as part of a haying operation. When this occurs, wetland indicators of one or more parameters may be lacking. For example, tillage would eliminate any onsite hydrologic indicator and would make detection of soil and vegetation indicators much more difficult. Corps Manual, Part IV, Section G; File 5, Tab 15, Pages 267.

In order to evaluate such problem area under Section G (i.e., to evaluate wetland hydrology where hydrology indicators appear to be absent), NRCS was required to first verify that indicators of hydrophytic vegetation and hydric soil were present or absent due to disturbance or other problem situations. Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Pages 442–448. As discussed above, NRCS verified that hydric soils were present in the Pothole. NRCS took eight samples from the area at issue, all of which exhibited indicators of hydric soils. File 3, Tab 5, Hearing Testimony, Page 76. Thus, the next consideration was whether indicators of hydrophytic vegetation were present or problematic. As discussed in more detail below, NRCS determined that hydrophytic vegetation was removed or altered. File 3, Tab 5, Hearing Testimony, Pages 31 and 35. Therefore, NRCS satisfied the first element of its analysis by determining that hydric soils were present and that hydrophytic vegetation was absent due to disturbance.

Next, NRCS was required to verify that the site was in a landscape position that was likely to collect or concentrate water. In this case, NRCS determined that the Pothole

Foster Request for Review
001249

Arlen and Cindy Foster                                                        12
Case No. 2011W000619

was a concave depression, which was conducive for collecting water. File 3, Tab 5, Hearing Testimony, Pages 35 and 42–43; *see* Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Pages 442–448.

Next, in evaluating the problem area, NRCS was permitted to use several approaches to determine whether wetland hydrology was present and whether the site was a wetland, including but not limited to determining whether the site visit occurred during the normal annual "dry season" or during a period with below-normal rainfall and evaluating multiple years of aerial photography. Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Pages 442–448. In this case, NRCS first determined that it visited the site during a period with below normal rainfall and that wetland hydrology indicators were lacking. File 3, Tab 5, Hearing Testimony, Pages 44–49; *see* File 4, Tab 15, Agency Record, Pages 72–83.

NRCS proceeded to analyze multiple years of aerial photography. File 3, Tab 5, Hearing Testimony, Page 49. NRCS examined the last twenty years of aerial photography and determined that ten photos were taken in years with normal rainfall. File 3, Tab 5, Hearing Testimony, Pages 49–55; *see* File 4, Tab 15, Agency Record, Pages 84–93. Of the ten normal-year photographs, NRCS observed wetness signatures in seven of the years. File 3, Tab 5, Hearing Testimony, Pages 55–56; *see* File 4, Tab 15, Agency Record, Pages 87–88. Because NRCS observed wetness signatures on photos in more than half of the years included in the analysis, NRCS determined that wetland hydrology was present at the Pothole. *See* Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Pages 446–447; *see also* File 4, Tab 15, Agency Record, Page 149 (SD-LTP-33).

On Director review, Appellants argue that NRCS failed to provide substantial evidence upon which the Hearing Officer could base his conclusion that the photographs showed wetness signatures in seven of the ten years. Appellants argue that the Hearing Officer lacked evidence to conclude that color-tone changes were indicative of wetness signatures. File 1, Tab 8. I disagree.

NRCS stated that it observed wetness signatures in seven of the ten normal-year photographs. Although NRCS did not offer much explanation regarding which wetness signatures were indicated by certain color-tone changes, NRCS's experts testified that the color-tone changes were indicative of various wetness signatures. *See* File 3, Tab 5, Hearing Testimony, Pages 49–56. Wetness signatures include surface water, saturated soils, flooded or drowned-out crops, stressed crops due to wetness, differences in vegetation patterns due to different planting dates, inclusion of wet areas into set-aside programs, unharvested crops, isolated areas that are not farmed with the rest of the field, patches of greener vegetation during dry periods, and other evidence of wet conditions. Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Pages 446–447; *see also* File 4, Tab 15, Agency Record, Page 149 (SD-LTP-33).

Foster Request for Review
001250

Arlen and Cindy Foster
Case No. 2011W000619

13

At the hearing, Appellants did not cross-examine NRCS's witness regarding his evaluation of wetness signatures in the aerial photography.  *See generally* File 3, Tab 5, Hearing Testimony, Pages 60–68.  Moreover, Appellants did not present any evidence or expert testimony to refute NRCS's conclusion that various wetness signatures were apparent in seven of ten normal-year photographs.  The burden is on Appellants to show error in NRCS's adverse decision, and Appellants were required on Director review to state specific reasons they believed the Hearing Officer's determination was erroneous.  *See* 7 C.F.R. §§ 11.8(e) and 11.9(a).  Where NRCS has come forward with a *prima facie* case, NRCS will prevail unless the evidence is discredited or rebutted by Appellants.  While NRCS's expert testimony might have been abbreviated and conclusory, Appellants failed to meet their burden because they did not challenge or discredit NRCS's testimony.  Therefore, I uphold the Hearing Officer's determination that the Pothole exhibits indicators of wetland hydrology, meaning that the Pothole fulfills the second criterion for identification of a wetland because it was inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions.

*Hydrophytic Vegetation*

Finally, when making its wetland determination, NRCS must determine whether such area or parcel would support a prevalence of hydrophytic vegetation under normal circumstances.  *See generally* 7 C.F.R. § 12.31(b); *see also* 16 U.S.C. § 3801(a)(27).  In the event the vegetation has been altered or removed, NRCS must determine if a prevalence of hydrophytic vegetation typically exists in the local area on the same hydric soil map unit under non-altered hydrologic conditions.  7 C.F.R. § 12.31(b)(2)(ii).

As discussed above, NRCS determined that hydric soils were present.  NRCS next needed to verify that one primary or two secondary indicators of wetland hydrology were present.  *See* File 6, Tab 15, Agency Record, Page 425; *see* File 4, Tab 15, Agency Record, Pages 147–148.  NRCS was unable to do so.  File 3, Tab 15, Agency Record, Page 49.  Typically, if indicators of either hydric soil or wetland hydrology are absent, the area is nonwetland, unless hydrology is also problematic.  Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Page 425.  In this case, NRCS determined that indicators of hydrology were problematic because the Pothole temporarily lacked hydrology due to dry conditions.  File 3, Tab 5, Hearing Testimony, Pages 44–49; *see* File 4, Tab 15, Agency Record, Pages 72–83.  Thus, NRCS evaluated problematic vegetation by determining whether hydrophytic vegetation typically exists in the local area on the same hydric soil map unit under non-altered hydrologic conditions.  File 3, Tab 5, Hearing Testimony, Pages 99–110; *see* 7 C.F.R. §12.31(b)(2)(ii); *see also* Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Pages 426 and 432.

Many natural plant communities throughout the Great Plains have been altered and are managed to meet human goals (e.g., periodic disking or plowing, mowing, planting, irrigation, herbicides).  These actions can result in elimination of certain species and their

Foster Request for Review
001251

Arlen and Cindy Foster                                                            14
Case No. 2011W000619

replacement with other species, changes in abundance of certain plants, and shifts in dominant species, possibly influencing a hydrophytic vegetation determination. Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Page 432.

When natural vegetation has been altered to such an extent that a hydrophytic vegetation determination may be unreliable, NRCS may examine the vegetation on a nearby, unmanaged reference site having similar soils and hydrologic conditions (and assume that the same plant community would exist on the managed site in the absence of human alteration). Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Page 432. In this case, NRCS determined that the vegetation had been disturbed or altered by Appellants' farming operation, making the remaining vegetation insufficient or unreliable for making a hydrophytic vegetation determination. File 3, Tab 5, Hearing Testimony, Pages 99 and 102. Thus, NRCS used a reference site to make its hydrophytic vegetation determination. File 3, Tab 5, Hearing Testimony, Pages 99 and 102.

Regarding reference sites, if indicators of hydric soil and wetland hydrology are present at the primary site, the primary site may be considered to be a wetland if the landscape setting, topography, soils, and vegetation are substantially the same as those on nearby wetland reference sites. Hydrologic characteristics of wetland reference sites should be documented by application of direct hydrologic observations. Reference sites should be minimally disturbed and provide long-term access. Soils, vegetation, and hydrologic conditions should be thoroughly documented and the data kept on file in the district or field office. Regional Supplement, Chapter 5; File 6, Tab 15, Agency Record, Page 434; *see* File 4, Tab 15, Agency Record, Page 170; *see also* 7 C.F.R. § 12.31(b)(2).

In this case, NRCS selected a reference site that was included in the same Tetonka hydric soil map unit and was in the same major land use area, which Agency defined as the "local area on the same hydric soil map unit" within the meaning of 7 C.F.R. § 12.31(b)(2)(ii). *See* File 3, Tab 5, Hearing Testimony, Pages 107–108. The hydrophytic vegetation sampling on the reference site was conducted in July 2000, and the reference site is still currently preserved grassland (i.e., it is minimally disturbed and provides long-term access). *See* File 3, Tab 5, Hearing Testimony, Page 105; *see also* File 7, Tab 15, Agency Record, Pages 655–662. The reference site is a prairie pothole similar to the Pothole. *See* File 3, Tab 5, Hearing Testimony, Page 108. The precipitation is similar between the reference site and the Pothole, and both sites had similar hydrologic regimes. File 3, Tab 5, Hearing Testimony, Page 109.

The reference site was a wetland and met all criteria, including the predominance of hydrophytic vegetation under normal circumstances. File 7, Tab 15, Agency Record, Pages 655–667; *see* File 3, Tab 5, Hearing Testimony, Pages 104–111. Because the reference site exhibited the necessary indicators of hydrophytic vegetation, the Pothole was considered to have the same plant community absent human interference. *See, e.g.,* File 4, Tab 15, Agency Record, Pages 43 and 46; *see also* File 6, Tab 15, Agency Record, Page 432. Therefore, NRCS concluded the Pothole would support a prevalence of

Foster Request for Review
001252

Arlen and Cindy Foster                                                                 15
Case No. 2011W000619

hydrophytic vegetation under normal circumstances.  File 3, Tab 5, Hearing Testimony,
Page 110.

On Director review, Appellants argue that the reference site used to determine
hydrophytic vegetation was not in the "local area" within the meaning of 7 C.F.R.
§ 12.31(b)(2)(ii).  *See* File 1, Tab 8.  Appellants estimated that the reference site was
approximately forty miles away from the Pothole.  File 3, Tab 5, Hearing Testimony,
Pages 146–147.  NRCS defined the "local area on the same hydric soil map unit" for
purposes of 7 C.F.R. § 12.31(b)(2)(ii) as being within the same major land use area and
on the same hydric soil map unit.  *See* File 3, Tab 5, Hearing Testimony, Pages 108–109.

I conclude NRCS's interpretation of its own regulation is reasonable.  Generally, an
agency's interpretation of its own regulation is entitled to substantial deference, unless the
interpretation is plainly erroneous or clearly inconsistent with the regulation interpreted.
*See Auer v. Robinson*, 519 U.S. 452, 461 (1997); *see also Thomas Jefferson University v.
Shalala*, 512 U.S. 504, 512 (1994).  On Director review, although Appellants'
interpretation is not unreasonable, my task is not to decide which among several
competing interpretations best serves the regulatory purposes.  Rather, I must defer to
NRCS's interpretation unless the plain language of the regulation compels an alternative
reading.  *See Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994).
Appellants failed to show that the plain language of the regulation compels an alternative
reading.  Therefore, NRCS's interpretation is reasonable, and I conclude that the
reference site is in the "local area on the same hydric soil map unit" for purposes of 7
C.F.R. § 12.31(b)(2)(ii) because it is in the same major land use area and on the same
hydric soil map unit.

That said, I conclude that the Hearing Officer's finding that the Pothole would support a
prevalence of hydrophytic vegetation under normal circumstances is supported by
substantial evidence in the record.  *See* File 4, Tab 15, Agency Record, Pages 43 and 46;
*see also* File 6, Tab 15, Agency Record, Page 432; *see also* File 3, Tab 5, Hearing
Testimony, Page 110.

To summarize, I have concluded that the Hearing Officer Appeal Determination,
specifically that the Pothole (a) had a predominance of hydric soils, (b) was inundated or
saturated by surface or groundwater at a frequency and duration sufficient to support a
prevalence of hydrophytic vegetation typically adapted for life in saturated soil
conditions, and (c) under normal circumstances would support a prevalence of
hydrophytic vegetation, is supported by substantial evidence in the record and that
NRCS's adverse decision is consistent with applicable regulations.

Foster Request for Review
001253

Arlen and Cindy Foster                                                          16
Case No. 2011W000619

## Conclusion

Based on the discussion above, I uphold the Hearing Officer Appeal Determination. I conclude that the Appellants did not prove by a preponderance of the evidence that the adverse decision was erroneous.

/s/ _____        07/16/2012 _____
James T. Murray                            Date
Deputy Director

Foster Request for Review
001254

Arlen and Cindy Foster
Case No. 2011W000619

17

**Original to:**

APPELLANTS:
Arlen and Cindy Foster
24314 421st Avenue
Fulton, SD 57340

**Copy to:**
Appellants' Representative:
Thomas A. Lawler, Esq.
601 Coates Street / P.O. Box 280
Parkersburg, LA 50665

Foster Request for Review
001255

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| ARLEN FOSTER and CINDY FOSTER | CIV. 13-4060-KES |
| Plaintiffs, | |
| vs. | MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| TOM VILSACK, Secretary, United States Department of Agriculture, | |
| Defendant. | |

Plaintiffs, Arlen and Cindy Foster, brought this suit under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06, against defendant, Tom Vilsack, Secretary of Agriculture, United States Department of Agriculture (USDA). Plaintiffs ask this court to set aside the USDA National Appeals Division's (NAD) final order, which upheld the Natural Resources Conservation Service's (NRCS) determination that 0.8 acres of land of plaintiffs' property was a wetland. The parties have filed cross motions for summary judgment. For the following reasons, defendant's motion for summary judgment is granted, and plaintiffs' motion for summary judgment is denied.

**BACKGROUND**

The undisputed facts are:

Plaintiffs own and farm land within Miner County, South Dakota. Defendant, as Secretary of the USDA and acting through the NRCS, is given the authority by Congress to make and approve wetland determinations,

Foster Request for Review
001256

delineations, and certifications. The parties contest whether a 0.8 acre portion of plaintiffs' land, known as "Site 1," has properly been determined to be a wetland.

In November 2004, the NRCS made an initial determination that Site 1 (then referred to as "Site 18") was a wetland. In July 2008, plaintiffs filed a request for the agency to reconsider its determination. In 2009, the NRCS made a second determination that Site 1 was a wetland, but rescinded its determination on January 15, 2010.[1] On November 23, 2010, the NRCS returned to Site 1 in order to conduct field work. On June 23, 2011, the NRCS made its third determination that Site 1 was a wetland. A.R. 5-7.

Following the June 23, 2011, determination, plaintiffs appealed to the NAD, an independent agency within the USDA. Pursuant to USDA statutes and regulations, plaintiffs bore the burden of proving the NRCS's determination "was erroneous by a preponderance of the evidence" in order to be successful on appeal. *See* 7 U.S.C. § 6997(c)(4); 7 C.F.R. § 11.8(e). On October 18, 2011, a hearing was held in Mitchell, South Dakota, where the parties were allowed to present exhibits, elicit witness testimony, and conduct cross-examination. On January 10, 2012, the hearing officer issued his decision, in which he determined the NRCS followed proper wetland determination procedures, that Site 1 was a wetland, and that plaintiffs had not met their burden of proving the NRCS's determination was erroneous. *See* A.R. 225-238.

---

[1] The agency's reason for rescission of the 2009 determination related to date changes within procedural manuals used by the agency. A.R. 200.

Foster Request for Review
001257

On February 13, 2012, plaintiffs filed a request for the NAD director to review the hearing officer's decision. A.R. 244-252. On July 16, 2012, the deputy director issued his final review determination, upholding the hearing officer's decision. Finally, on May 31, 2013, plaintiffs filed this suit seeking relief from the deputy director's final determination. Docket 1. Pending before the court are motions for summary judgment from both parties regarding the NAD's final decision and order.

## LEGAL STANDARD

Generally, a motion for summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Clark v. Kellogg Co.*, 205 F.3d 1079, 1082 (8th Cir. 2000). Although presented as motions for summary judgment, the parties are seeking this court's review of an agency's decision. Thus, the court must follow the standards set forth in the APA. *See Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004); 5 U.S.C. § 706(2). Because agency decisions are reviewed, "the issue is not whether the material facts are disputed, but whether the agency properly dealt with the facts." *Lodge Tower Condo. Ass'n v. Lodge Properties, Inc.*, 880 F. Supp. 1370, 1374 (D. Colo. 1995). Therefore, the function of this court is to determine, as a matter of law, whether the agency's decision is supported by the administrative record and is consistent with the APA standards of review. *See, e.g., Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766,

Foster Request for Review
001258

769 (9th Cir. 1985); *Troy Corp. v. Browner*, 120 F.3d 277, 282 (D.C. Cir. 1997);

*Girling Heath Care, Inc. v. Shalala*, 85 F.3d 211, 214 (5th Cir. 1996).

Pursuant to the standards of review provided in the APA, this court will

set aside an agency's decision if it was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." *Sierra Club v. E.P.A.*, 252

F.3d 943, 947 (8th Cir. 2001) (quoting 5 U.S.C. § 706(2)(A)). As the Supreme

Court has explained, agency action is "arbitrary or capricious" if

> [T]he agency has relied on factors which Congress has not
> intended it to consider, entirely failed to consider an important
> aspect of the problem, offered an explanation for its decision that
> runs counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in view or
> the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983). Additionally, this court "must also accept the agency's factual

findings if they are supported by substantial evidence." *Maverick Transp., LLC

v. United States Dep't of Labor, Admin. Review Bd.*, 739 F.3d 1149, 1153 (8th

Cir. 2014). " 'Substantial evidence is relevant evidence that a reasonable mind

would accept as adequate to support the [agency's] conclusion.' " *Id.* (quoting

*Steed v. Astrue*, 524 F.3d 872, 874 (8th Cir. 2008)) (alteration in original).

Although this court's review of the facts before the agency is "searching

and careful," the "standard of review is a narrow one. The court is not

empowered to substitute its judgment for that of the agency." *Citizens to

Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *overruled on

other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). If the agency's

- 4 -

Foster Request for Review
001259

decision "is supportable on any rational basis," it must be upheld. *Voyageurs*, 381 F.3d at 763 (citing *Friends of Richards-Gebaur Airport v. FAA*, 251 F.3d 1178, 1184 (8th Cir. 2001)). "This is especially true when an agency is acting within its own sphere of expertise." *Id.* Thus, "[w]hen the resolution of the dispute involves primarily issues of fact and analysis of the relevant information 'requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies.' " *Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989)).

Nonetheless, "[t]he agency must articulate a 'rational connection between the facts found and the choice made.' " *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). While this court cannot "supply a reasoned basis for the agency's action that the agency itself has not given," it may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 285-86 (internal citations omitted). This court's review is limited to the administrative record as it existed before the agency, rather than encompassing new evidence presented here for the first time. *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

## DISCUSSION

### A.   Agency Action

This case is before the court pursuant to the APA. Because there appears to be disagreement on which agency action–that of the NRCS or that of the

Foster Request for Review
001260

NAD–is subject to review, clarification is warranted. *See, e.g.*, Docket 19 at 16 (arguing the NRCS's use of the Tetonka reference site was arbitrary and capricious); Docket 23 at 9 (describing this appeal as concerning the NAD deputy director's determination).

Following the NRCS's determination that Site 1 was a wetland, plaintiffs properly filed an appeal to the NAD. *See, e.g.*, 7 C.F.R §§ 12.6(c)(9); 614.1. Although the NAD and NRCS are both within the USDA, the NAD is an agency "independent from all other agencies and offices of the [USDA], including [USDA] officials at the state and local level." 7 C.F.R § 11.2(a). Initially, appeals before the NAD are assigned to a hearing officer who issues an appeal determination. *See* 7 U.S.C § 6997(d). Either party may then appeal to the NAD director for a review of the hearing officer's decision. 7 U.S.C. § 6998. Thus, "[t]he hearing officer's decision on the merits could then be appealed to the NAD Director, and the Director's decision on the merits then would become a final agency action subject to judicial review in accordance with the Administrative Procedure Act." *Bartlett v. United States Dep't of Agric.*, 716 F.3d 464, 474 (8th Cir. 2013);[2] *see also Lane v. United States Dep't of Agric.*, 120 F.3d 106, 109 (8th Cir. 1997) (detailing NAD hearing and appeal process).

Therefore, it is the "final determination of the [NAD]," rather than the determination of the NRCS, which "shall be reviewable . . . in accordance with" the APA. *See* 7 U.S.C. § 6999; *see also Bartlett*, 716 F.3d at 470. Because it is

---

[2] Pursuant to USDA regulations, the director is permitted to delegate review authority to deputy or assistant directors within the USDA, whose final determination is considered to be that of the director's. 7 C.F.R. § 11.9(d)(3).

Foster Request for Review
001261

the NAD's final determination that is being reviewed, the question is not whether, for example, the NRCS itself acted arbitrarily or capriciously with respect to its wetland determination procedures. Rather, the inquiry is whether the NAD acted arbitrarily or capriciously by concluding that the NRCS followed proper wetland determination procedures when it found that Site 1 was a wetland and that plaintiffs had not met their burden of proving the NRCS's determination was erroneous. *See, e.g.*, *Dawson Farms v. Risk Mgmt. Agency*, 698 F.3d 1079, 1083 (8th Cir. 2012) (subjecting the NAD deputy director's decision to the arbitrary or capricious standard); *Clason v. Johanns*, 438 F.3d 868, 870-71 (8th Cir. 2006) (determining whether the NAD's conclusion was arbitrary or capricious); *Von Eye v. United States*, 92 F.3d 681, 685 (8th Cir. 1996) (explaining the court "must uphold the [NAD's] decision unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' ") (quoting 5 U.S.C. § 706(2)(A)).[3] Although only the NAD's final decision is being reviewed, the court will nonetheless construe the parties' arguments aimed at the NRCS's procedures as if they were directed toward the NAD's decision.

## B.   Wetland Determination

As part of the Food Security Act of 1985, Congress enacted what are commonly referred to as "Swampbuster" provisions "[i]n order to combat the disappearance of wetlands through their conversion into crop lands[.]" *Gunn v.*

_____

[3] In the *Von Eye* decision, the Eighth Circuit denoted the National Appeals Division as the "NDS" rather than the NAD. *See Von Eye*, 92 F.3d at 682. The alteration here is for clarity.

Foster Request for Review
001262

*United States Dep't of Agric.*, 118 F.3d 1233, 1235 (8th Cir. 1997) (citing 16

U.S.C. §§ 3801, 3821-24); *see also Barthel v. United States Dep't of Agric.*, 181

F.3d 934, 935 (8th Cir. 1999). Originally, Swampbuster made anyone

"produc[ing] an agricultural commodity on converted wetland" ineligible for

certain USDA benefits. *See* 16 U.S.C. § 3821(a)-(b). Beginning in 1990,

however, Congress expanded the reach of Swampbuster to affect individuals

whose conversion of wetlands made "the production of an agricultural

commodity possible[.]" § 3821(d). Although Swampbuster did not make the

conversion of wetlands for agricultural purposes illegal, it "did provide that any

agricultural production on a converted wetland would cause the farmer to

forfeit his eligibility for a number of federal farm-assistance programs." *Gunn*,

118 F.3d at 1235.

Under Swampbuster, the USDA is directed to determine, delineate, and

certify wetlands on farmland. 16 U.S.C. § 3822(a)(1). The NRCS, an agency

within the USDA, is specifically charged with making the technical wetland

determinations, delineations, and certifications. 16 U.S.C. § 3822(j); 7 C.F.R

§ 12.30(a)(3). In order for a parcel of land to be declared a wetland, three

criteria must be present: (1) the land has a predominance of hydric soils; (2)

the land has sufficient wetland "hydrology;"[4] and (3) under normal

---

[4] The phrase "hydrology" is used as a shorthand for the statute's second
criteria that a wetland "is inundated or saturated by surface or groundwater at a
frequency and duration sufficient to support a prevalence of hydrophytic
vegetation typically adapted for life in saturated soil conditions." 16 U.S.C.
§ 3801(a)(27).

Foster Request for Review
001263

circumstances, the land supports a prevalence of hydrophytic vegetation. 16 U.S.C. § 3801(a)(27); 7 C.F.R. § 12.2(a).

To assist the NRCS in making wetland determinations, the agency was directed to "[d]evelop and utilize off-site and on-site wetland identification procedures[.]" 7 C.F.R. § 12.30(a)(4). To this end, the NRCS relies on several technical manuals and publications that describe the scientific procedures NRCS employees must follow when making a wetland determination. The manuals relevant to this discussion are:

1. National Food Security Act Manual (NFSAM); Part 527, Wetland Identification Procedures (Dec. 2010) (A.R. 452-473)
2. NFSAM; Part 514,Wetland Determination & Labels (2010) (A.R. 907 – 928)
3. 1987 U.S. Army Corps of Engineers Wetland Delineation Manual (COE Manual), Parts I & IV (A.R. 485-492; 520-571)
4. COE Manual Regional Supplement (CEO Regional Supplement): Great Plains Region Version 2.0 (March 2010)(A.R. 617-770)
5. NRCS South Dakota Mapping Conventions for Determining Potential Wetlands (A.R. 437-451)
6. Fish & Wildlife Service's National List of Plant Species that Occur in Wetlands: North Plains (May 1988)(A.R. 819-891)

Reference will be made to these manuals in conjunction with the procedures described below.

### i.    **Hydric Soils**

To establish the first criterion for a wetland determination, the land must have "a predominance of hydric soils." 16 U.S.C. § 3801(27)(A); 7 C.F.R. § 12.2(a). The term "hydric soils" is further defined as "soil that, in its undrained condition, is saturated, flooded, or ponded long enough during a growing season to develop an anaerobic condition that supports the growth and regeneration of hydrophytic vegetation." 16 U.S.C. § 3801(12).

- 9 -

Foster Request for Review
001264

The deputy director agreed with the hearing official that Site 1 had a prevalence of hydric soils. A.R. 292. The deputy director also noted that plaintiffs did not challenge the NRCS's finding that Site 1 did, in fact, have a predominance of hydric soils. *Id.* Here, similarly, plaintiffs do not challenge this finding, instead focusing on the hydrology and hydrophytic vegetation criteria. *See* Docket 19 at 28-29 (". . . the only reliable, untainted finding made by the Agency, using lawful wetland procedures, was that the area contained hydric soil."). Although the predominance of hydric soils on Site 1 is not disputed, a brief description of the agency's procedure and findings will be useful during the subsequent discussion.

USDA regulations direct the NRCS to "identify hydric soils through the use of published soil maps which reflect soil surveys completed by NRCS or through the use of on-site reviews." 7 C.F.R. § 12.31(a)(1). Pursuant to procedures provided in the NRCS South Dakota Mapping Conventions, the agency initially reviewed a soil survey that revealed the presence of the "Clarno-Stickney-Tetonka" complex in the area of Site 1. A.R. at 65. This complex, referred to as "Tetonka," was listed on the county's hydric soils list. *Id.* The NRCS also reviewed its prior determinations regarding Site 1, investigated whether there had been any manipulations to the area prior to 1985, consulted national wetland inventory maps, and viewed other data within the agency's possession. *Id.* at 64-65. Based on these data, the NRCS determined Site 1 had wetland characteristics. *Id.* at 69.

Foster Request for Review
001265

Additionally, a soil scientist within the agency took ten soil samples. *Id.* at 115.[5] Of the eight soil samples taken from within Site 1, six were determined to be hydric. *Id.* at 124; *see also id.* at 355-364 (soil survey data sheets). Specifically, the six soil samples that were determined to be hydric were consistent with the Tetonka variety of hydric soils. *Id.* at 118. The other two samples taken from the surrounding area outside of Site 1 did not contain indicators of hydric soils. *Id.* at 129-130. Because six of the eight samples from within Site 1 were hydric, the agency determined Site 1 contained a predominance of hydric soils. *Id.* Thus, the first wetland criterion was established.

### ii. Hydrology

The deputy director upheld the hearing officer's conclusion that Site 1 exhibited wetland hydrology. *Id.* at 295. The deputy director also explained that plaintiffs had not presented "any evidence or expert testimony to refute NRCS's conclusion[s]" or otherwise met their burden to show the NRCS's determination was wrong. *Id.* Here, as argued before the NAD, plaintiffs contend the NRCS improperly relied on so-called "color tone changes" observed from aerial photography to determine Site 1 had wetland hydrology. *See, e.g.*, Docket 19 at 22. Defendant responds that its use of aerial photography was permissible, and that plaintiffs misconstrue the agency's use of "color tone changes" in order to fill out data summary forms. *See, e.g.*, Docket 23 at 27-29.

---

[5] An aerial map depicting the location of the sample sites was included within the agency record. *See* A.R. 354.

Foster Request for Review
001266

In order to satisfy the second wetland criteria, the NRCS must determine if a parcel of land exhibits wetland hydrology. *See* 16 U.S.C. § 3801(a)(27)(B); 7 C.F.R. § 12.2(a). According to the COE Regional Supplement, South Dakota–and therefore Site 1–is located within the "Great Plains Region" of the United States. A.R. 631. Regarding hydrology in this region, the COE Regional Supplement explains:

> Wetlands are areas that are flooded or ponded, or have soils that are saturated with water, for long periods during the growing season in most years . . . However, some wetlands in the Great Plains do not become inundated or saturated in some years and, during drought cycles, may not inundate or saturate for several years in a row.

A.R. 745. Michelle Burke, an agricultural engineer with the NRCS noted that, at the time of the agency's November 2010 on-site visit, Site 1 was drier than it would be under normal environmental conditions during the spring growing season. *Id.* at 67. When seasonal or annual changes prevent normal environmental conditions from being present within areas less than 5 acres in size, like Site 1, the COE Manual directs the NRCS to follow the procedures in Part IV, Subsection G. *Id.* at 537-38.

Part IV, Subsection G, of the COE Manual is titled "Problem Areas." *Id.* at 569. It specifically identifies one type of problem area known as a "prairie pothole." *Id.* at 570.

> Prairie potholes normally occur as shallow depressions in glaciated portions of the north-central United States. . . . During dry years, potholes often become incorporated into farming plans, and are either planted to row crops (e.g., soybeans) or are mowed as part of a haying operation. When this occurs, wetland indicators of one or more parameters may be lacking. For example, tillage would

- 12 -

Foster Request for Review
001267

> eliminate any onsite hydrologic indicator, and would make
> detection of soil and vegetation indicators much more difficult.

*Id.* Burke explained that, at the time of the agency's visit, Site 1 was "located

on cropland with herbaceous vegetation removed generally by cropping and

tillage." *Id.* at 71. She also explained Site 1 existed in "a pothole region with

many small depressions in the area." *Id.* at 67. Subsequently, Site 1 was

determined to be a prairie pothole that may lack indicators of hydrology. *Id.* at

74; 78. On this point, the parties are not in dispute. *See* Docket 19 at 24 ("Site

1 is a prairie pothole, which is an area that periodically lacks indicators of

wetland hydrology."); *see also* Docket 23 at 26.

The COE Regional Supplement notes that "hydrology determinations are

based on indicators," and that some areas may lack indicators "particularly

during the dry season or in a dry year." A.R. at 745. During its on-site

inspection, the NRCS was unable to detect sufficient indicators of wetland

hydrology at Site 1. *Id.* at 91. If a potential wetland periodically lacks hydrology

indicators, the COE Regional Supplement identifies a three-step procedure to

follow. *Id.* at 746-751. The first step requires that "indicators of hydrophytic

vegetation and hydric soil are present or absent due to disturbance or other

problem situations." *Id.* at 746. The second step requires verification that "the

site is in a landscape position that is likely to collect or concentrate water." *Id.*

The third step directs the NRCS to employ one or more approaches to

determine if hydrology at the site is present. *Id.*

Foster Request for Review
001268

Regarding the first step, as previously discussed, the NRCS established the presence of hydric soil indicators in Site 1. Additionally, as discussed more fully below, the NRCS also determined indicators of hydrophytic vegetation had been removed or altered due to plaintiffs' farming operation. *Id.* 141. With respect to the second step, Burke explained Site 1 was "a concave area" that would "naturally pond water." *Id.* at 77. Regarding the third step, of the several approaches listed in the COE Regional Supplement, the NRCS chose to evaluate multiple years of aerial photography. *Id.* at 78. As explained in the COE Regional Supplement,

> The procedure uses five or more years of growing-season photography and evaluates each photo for wetness signatures that are listed in "wetland mapping conventions" developed by NRCS state offices. . . . Only photos taken in normal rainfall years, or an equal number of wetter-than-normal and drier-than-normal years, are used in the analysis. If wetness signatures are observed on photos in more than half of the years included in the analysis, then wetland hydrology is present.

*Id.* at 750.[6] The NRCS South Dakota Mapping Conventions identify ten wetland signatures the agency should look for: (1) hydrophytic vegetation; (2) surface water; (3) saturated conditions; (4) flooded or drowned-out crops; (5) stressed crops due to wetness; (6) differences in vegetation due to different planting dates; (7) inclusion of wet areas as set-aside or idled; (8) circular or irregular areas of unharvested crops within a harvested field; (9) isolated areas that are not farmed with the rest of the field; and (10) areas of greener vegetation (especially during dry years). *Id.* at 451. If any of the wetland signatures appear

---

[6] These photos are taken by the Farm Service Agency (FSA) each year to monitor farmlands involved with USDA programs. A.R. at 749-50.

Foster Request for Review
001269

in greater than fifty percent of the "normal" rainfall year photos, the presence of wetland hydrology is established. *Id.*

Burke explained that the agency reviewed aerial photographs of Site 1 from the past twenty years. *Id.* at 91. Between 1991 and 2010, the agency determined that ten out of those twenty years received normal amounts of rainfall. A.R. 389-90.[7] After analyzing the aerial photos, Burke determined there were wetland signatures present at Site 1 in seven out of the ten normal rainfall years. *Id.* at 97. Because more than 50 percent of the normal rainfall years contained wetland signatures, the NRCS concluded Site 1 met the wetland hydrology criterion. *Id.* at 99.

Here, plaintiffs raise two challenges regarding the aerial photograph procedure. First, plaintiffs briefly contest that because they filed an appeal with the NAD, the NRCS was precluded from using any off-site investigation methods such as aerial photography to determine if Site 1 was a wetland. Docket 23 at 28 (citing 7 C.F.R. § 12.30(c)(3)). On this point, defendant responds that plaintiffs have conflated two separate issues with respect to the need for an on-site determination. Docket 23 at 27.

Initially, the Eighth Circuit has, in general language, upheld the use of aerial photographs in order to establish wetland hydrology. *See Downer v. United States*, 97 F.3d 999, 1003 (8th Cir. 1996) (concluding "[a]gency regulations bear out the agency's contention" that the use of aerial

---

[7] The small "N" near the upper-left corner of the box containing the date indicates that year was a "normal" one for rainfall purposes. *See* A.R. 389-90.

- 15 -

Foster Request for Review
001270

photographs are "standard in its field of expertise and soil conservation."). Nonetheless, the regulation cited by plaintiffs provides

> In the case of an appeal, NRCS will review and certify the accuracy of the determination of all lands subject to the appeal to ensure that the subject lands have been accurately delineated. Prior to a decision being rendered on the appeal, NRCS will conduct an on-site investigation of the subject land.

7 C.F.R. § 12.30(c)(3). The NRCS did, in fact, conduct an on-site investigation at Site 1 in November 2010. There is nothing in the language of the regulation that precludes the use of additional off-site tools as the procedural manuals instruct. Thus, plaintiffs have not shown that a wetland determination must be made solely by on-site methods.

Second, plaintiffs argue that it was improper for the agency to rely upon the so-called "color tone difference" wetland signature in order to determine Site 1 had wetland hydrology, because "color tone difference" is not one of the signatures provided for in the NRCS South Dakota Mapping Conventions. *See* Docket 19 at 25-26. Further, plaintiffs contend that the aerial photographs themselves demonstrate how unreliable differences in color tone can be, and that the NRCS offered no explanation for how the differences in the photos documented any wetland signatures. *Id.* at 26-27. The deputy director upheld the hearing officer's rejection of plaintiffs' "color tone differences" argument, noting that plaintiffs had not attempted to discredit Burke's testimony regarding the presence of wetland signatures nor had plaintiffs presented their own evidence sufficient to satisfy their burden of proof. A.R. 294-95. In its response, defendant argues it properly used the "color tone difference"

Foster Request for Review
001271

shorthand in order to fill out its data summary forms and, furthermore, that the agency never claimed "color tone difference" was an independent wetland signature. Docket 23 at 28-30.

The NRCS South Dakota Mapping Conventions specify ten wetland signatures that the agency should look for when using aerial photography to establish wetland hydrology. These wetland signatures are found on what is labeled "form SD-LTP-33" (form 33). *See* A.R. 451. Further instruction provides that "[t]he results of the [form 33] procedure must be documented correctly on form SD-LTP-28[.]" *Id.* at 450. This second form, SD-LTP-28 (form 28), is titled as a "data summary," which lists four abbreviations that can be used to document the presence of wetland signatures. *See id.* at 390. The four abbreviations are listed as "NC = No crop; INU = Inundation; CT = Color tone difference; PHM = Potential Hydrological Manipulation[.]" *Id.* Burke used the "CT" abbreviation when she filled out form 28. *See id.* at 390-91.

While plaintiffs are correct that "CT" or "color tone difference" is not one of the ten wetland signatures provided in the NRCS South Dakota Mapping Conventions, defendant is correct that "CT" is one of only four options available to fill out form 28. Because form 33 directs the NRCS to document their findings on form 28, and because form 28 specifically provides only four abbreviations that can be used, one of which is "CT," the court finds that defendant is correct that Burke completed form 28 as it was intended to be used. *See* Docket 23 at 30.

Foster Request for Review
001272

Additionally, Burke testified that her analysis of the aerial photographs revealed the presence of wetland signatures in seven of ten normal rainfall years. A.R. at 97. Her testimony also provided some details of how portions of form 28 were filled out before arriving at her conclusion. *See id.* at 94. Plaintiffs chose not to cross-examine Burke regarding the contents of form 28, however, and they did not ask her to clarify which signatures were observed. Plaintiffs bore the burden of proving the NRCS's determination was erroneous by a preponderance of the evidence. While not specifying which signatures she found, Burke's testimony indicated that wetland signatures were observed during a sufficient number of normal rainfall years in order to establish the hydrology criterion. As the deputy director explained, although parts of Burke's testimony were "abbreviated and conclusory," plaintiffs failed to meet their burden because they did not challenge her testimony regarding the presence of wetland signatures. *See id.* at 295. Plaintiffs' concern that "[w]hat the color changes identify specifically is completely unknown beyond the particular Agency reviewer," Docket 19 at 27, could have been addressed during cross-examination of Burke or by presenting their own expert witness to analyze the photographs. But plaintiffs did neither.

Moreover, plaintiffs' opinion regarding the reliability of using observable color tone differences from the aerial photographs is problematic for several reasons. First, as discussed, the record shows that Burke filled out form 28 in accordance with NRCS procedures. Second, Burke testified she is a licensed professional engineer with 21 years of experience working with the NRCS. A.R.

Foster Request for Review
001273

at 61. Her position involves engineering and wetland hydrology determination responsibilities. *Id.* By contrast, plaintiffs have no comparable scientific expertise that would be relevant to interpreting the aerial photographs for wetland hydrology signatures. Third, Burke testified that she observed wetland signatures in seven of the ten normal rainfall years. Plaintiffs' rhetorical question, "[w]hat does the green dot [in one photo] show that is not present in the other green areas," Docket 19 at 27, would have been more appropriately asked during Burke's cross-examination than in their brief.[8] Consequently, plaintiffs' hindsight effort to undermine the credibility of the agency's witness and the aerial photography is unpersuasive.

Finally, the bedrock of plaintiffs' argument is that the agency should have provided a better explanation with respect to which signatures the "color tone differences" shorthand corresponds. Plaintiffs fault the NAD's final decision because "[n]o evidence from the Agency has been presented that indicates the color changes identify wetland signatures." Docket 19 at 27. As the deputy director observed, however, the NRCS offered testimony that a sufficient number of wetland signatures were present to establish the hydrology requirement. A.R. 295. Additionally, as the deputy director concluded, because plaintiffs did not challenge this testimony or offer any expert testimony to the contrary, plaintiffs did not meet their burden of proving

---

[8] Defendant offered an answer to plaintiffs' question of what specific signatures may have been observed. *See* Docket 23 at 31. The scope of this court's review, however, is limited to what appeared in the record before the agency, and does not extend to new evidence offered for the first time on appeal. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973).

Foster Request for Review
001274

the NRCS's determination was erroneous. *Id.* Ultimately, the deputy director agreed with the hearing officer's determination that Site 1 met the hydrology criterion. That the NAD ultimately found the unchallenged expert testimony of the NRCS persuasive cannot be said to be an "explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Because of the evidence before it and the allocation of the burden of proof between the parties, the court concludes the NAD articulated "a 'rational connection between the facts found and the choice made.' " *Bowman Transp.*, 419 U.S. at 285 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Therefore, the court finds the deputy director did not act arbitrarily or capriciously by upholding the hearing officer's conclusion that Site 1 exhibited wetland hydrology.

### iii.  Hydrophytic Vegetation

The deputy director agreed with the hearing officer that Site 1, after following the NRCS's reference site procedure, met the hydrophytic vegetation criterion. A.R. 297. Plaintiffs assert the NRCS's use of the Tetonka reference (or "comparison") site was improper because it allowed the agency to circumvent the need for establishing all three wetland criteria and is otherwise inconsistent with USDA regulations. *See, e.g.*, Docket 19 at 16-17. Defendant argues use of the reference site under the circumstances was proper. *See, e.g.*, Docket 23 at 17-18.

- 20 -

Foster Request for Review
001275

The term "hydrophytic vegetation" is defined as "plants growing in water or in a substrate that is at least periodically deficient in oxygen during a growing season as a result of excessive water content." 7 C.F.R § 12.31(b). In order to establish this third wetland criterion, the NRCS must determine whether, "under normal circumstances," the land supports a prevalence of hydrophytic vegetation. 16 U.S.C. § 3801(27)(C); 7 C.F.R § 12.2(a). If the land's vegetation has been altered or removed, however, the NRCS must "determine if a prevalence of hydrophytic vegetation typically exists in the local area on the same hydric soil map unit under non-altered hydrologic conditions." 7 C.F.R. § 12.31(b)(2)(ii). The COE Regional Supplement further explains that the NRCS should "[e]xamine the vegetation on a nearby, unmanaged reference site having similar soils and hydrologic conditions." A.R. 735. Following this procedure, the agency may then "[a]ssume that the same plant community would exist on the [altered] site in the absence of human alteration." *Id.* Additionally, "[r]eference sites should be minimally disturbed and provide long-term access." *Id.* at 738.

Kevin Luebke, a biologist with the agency, testified that Site 1's vegetation had been altered or removed by plaintiffs' farming operation, which made an on-site determination of the prevalence of hydrophytic vegetation unreliable. *Id.* at 141.[9] Because the hydrophytic vegetation determination could

---

[9] Plaintiffs cite *S.E.C. v. Chenery Corp.*, 332 U.S. 194 (1947) for the proposition that the NAD's decision cannot be sustained because the NRCS failed to adequately present evidence that shows how the Tetonka reference site met the USDA regulation's requirements in order to show Site 1 had a prevalence of hydrophytic vegetation. *See* Docket 25 at 7. Plaintiffs bore the burden of proving the NRCS's determination was erroneous. For that reason, and for the reasons

Foster Request for Review 001276

not be made on Site 1, the agency used a reference site for comparative purposes. *Id.* at 144. The site chosen was referred to as the "Tetonka reference site," and is located in Kingsbury County, South Dakota. *Id.* at 146; *see also id.* at 960. The Tetonka site was "from an approved list of sites previously established." *Id.* at 146. According to Luebke, these reference sites were established to insure that suitable reference sites would be available for future use. *Id.* Additionally, a map attached to the administrative record shows the Tetonka site is located approximately 33 miles from Site 1. *Id.* at 1117. Luebke described the Tetonka site as a pothole, similar to Site 1. *Id.* at 151. Further, according to his testimony, both the Tetonka site and Site 1 received between 18 and 25 inches of rain per year. *Id.* at 152.

Luebke also testified that the agency had acquired the Tetonka site's hydrophytic vegetation data from around the July 2000 growing season. *Id.* at 147. Because the site has been preserved as a reference site, it would still retain those same vegetative characteristics. *Id.* at 147-49. According to Luebke, the reference site bore the same Tetonka hydric soils as Site 1 and contained similar wetland hydrology as Site 1. *Id.* at 150-51. Luebke also explained that the Tetonka reference site was on the same "major land resource area" (MLRA) as Site 1, which, according to his testimony, was the agency's interpretation of the regulation's "local area" language. Thus, according to Luebke, the Tetonka site met each of the USDA regulation's requirements and could be used as a reference site to determine Site 1's hydrophytic vegetation.

---

that follow, the court disagrees with plaintiffs' contention.

Foster Request for Review
001277

*Id.* Following a comparison to the reference site, the agency concluded Site 1 would have supported a prevalence of hydrophytic vegetation in the absence of human alteration. *Id.* at 153. Notably, plaintiffs chose not to cross-examine Luebke. *Id.*

The parties do not dispute that the vegetation on Site 1 has been altered or removed. *See* Docket 19 at 17; Docket 23 at 17. Additionally, the parties do not dispute that the NRCS may use reference sites to make the hydrophytic vegetation inquiry under such circumstances. Rather, the parties dispute whether use of the reference site in this instance allowed the NRCS to bypass determining the other wetland criteria, as well as the precise meaning of the USDA regulation's "local area" language.

### a.   Conflation of Wetland Criteria

First, plaintiffs contend that the use of a pre-determined wetland as a reference site will always result in the conclusion that areas compared to it will be found to have hydrophytic vegetation. Docket 19 at 17. According to plaintiffs, this allows the agency to conflate the separate requirements that the land have a prevalence of hydric soil with the requirement that the land support a prevalence of hydrophytic vegetation. *Id.* at 19 (citing *B&D Land & Livestock Co. v. Schafer*, 584 F. Supp. 2d 1182, 1194-95 (N.D. Iowa 2008)). Defendant responds that the agency gave consideration to each wetland determination criteria, and, citing *Downer*, notes that the Eighth Circuit has upheld the use of reference sites. Docket 23 at 25. While plaintiffs' conflation argument was not specifically raised before the NAD, the deputy director

Foster Request for Review
001278

ultimately concluded that the NRCS's use of a reference site was permissible. A.R. at 297.

Although first discussed in conjunction with the NRCS's use of aerial photographs, the Eighth Circuit has also, in general terms, upheld the agency's use of comparison sites. *See Downer*, 97 F.3d at 1003-04. Plaintiffs contend, however, that the Eighth Circuit has not considered specific challenges to the use of comparison sites because the only issue raised by the plaintiff in *Downer* was whether the use of off-site tools was acceptable. Docket 25 at 11 (citing *Downer*, 97 F.3d at 1003)). Regardless, plaintiffs' characterization of the reference site procedure is flawed for several reasons.

The USDA regulation contemplates use of a reference site to establish the hydrophytic vegetation criterion if the vegetation on a potential wetland has been altered or removed. Further, if the regulatory requirements for using a reference site are met, then the agency may assume the same plant community that exists on the reference site would also exist on the altered site had its vegetation not been altered or removed. *See* A.R. 735. Pursuant to the USDA regulation, the reference site must be in the "local area," as well as on the "same hydric soil map unit" which is "under non-altered hydrologic conditions." *See* 7 C.F.R. § 12.31(b)(2)(ii). Thus, the regulation required the NRCS to establish an equivalence between the hydric soils found on Site 1 and the reference site, as well as a connection between the hydrologic conditions on Site 1 and the reference site. Additionally, the agency needed to select a reference site located within the "local area." Luebke's testimony that the

Foster Request for Review
001279

agency made each of these findings went unchallenged, and the deputy director concluded the reference site met all of the regulatory requirements. *See* A.R. 296-97.

The present situation is therefore different from that described in the *B&D Land & Livestock* decision where the agency simply treated the prevalence of hydrophytic vegetation as sufficient to establish the wetland hydrology criterion. *See B&D Land & Livestock*, 584 F. Supp. 2d at 1199. Here, because the natural conditions of Site 1 had been altered or were temporarily lacking, the USDA regulations required the "local area" and "non-altered hydrologic conditions" to be met. *See* 7 C.F.R § 12.31(b)(2)(ii). Rather than conflating the wetland criteria, the agency followed the proper regulatory procedure that applied to the circumstances present on Site 1.

Further, plaintiffs' objection that the reference site had previously been determined to be a wetland is answered by the COE Regional Supplement's policy, which directs reference sites to be "minimally disturbed and provide long-term access" for comparative purposes. A.R. 738. Thus, using an established and maintained wetland as a reference site allows the agency to compare potential sites to it for a longer period of time, as well as ensuring the "non-altered hydrologic conditions" requirement can be analyzed. Moreover, it would make little sense for the agency to attempt to compare a potential wetland to a parcel of land whose properties were unknown. Finally, even without regard to the COE Regional Supplement's policy, as the hearing officer explained, plaintiffs "cite[d] no policy or provision that prohibits this practice. It

- 25 -

seems a reasonable and cost effective way of making determinations when the comparison site meets the [regulatory] requirements[.]" A.R. 236. Thus, although not specifically argued before the NAD, the record shows that the NRCS did not conflate the separate wetland criteria by using a reference site.

### b.    The "Local Area" Requirement

Second, regarding use of the specific Tetonka site itself, plaintiffs raise a series of arguments with respect to the "local area" requirement of the USDA regulation. One of the regulatory elements for using a reference site is that the site be "in the local area." *See* 7 C.F.R. § 12.31(b)(2)(ii). The parties have provided no prior legal authority interpreting the "local area" language, and instead, offer competing definitions and examples.

Kevin Luebke testified that the NRCS interprets the "local area" requirement as encompassing the land within an MLRA. A.R. 151-52.[10] According to Luebke, because Site 1 and the Tetonka reference site were both within the MLRA designated as "55C," use of the Tetonka reference site satisfied the regulation's "local area" element. *Id* at 151-52. Luebke concluded that because each of the regulation's other requirements were satisfied as well, the Tetonka site could be used as a reference site. *Id.*

Regarding the meaning of the "local area" language, the deputy director ultimately found that the "NRCS's interpretation of its own regulation is reasonable" and therefore, entitled to deference. A.R. 297 (citing *Auer v.*

---

[10] MLRAs are described as "geographically associated land resource units" which are demarcated after a consideration of characteristics such as their "physiography, geology, climate, water, soils, and land use." A.R. 403.

Foster Request for Review
001281

*Robbins*, 519 U.S. 452, 461 (1997)). The deputy director considered but rejected plaintiffs' argument that the Tetonka site was not within the "local area" as contemplated by the regulation. *Id.* Thus, the deputy director concluded that, because Site 1 and the Tetonka site were within the same MLRA, the Tetonka site was in the "local area." *Id.*

Here, plaintiffs argue that deference is owed instead to the authors of the NFSAM. Docket 19 at 21. Plaintiffs do not specify an alternative definition for the "local area" language, but they assert that the NRCS should have limited its investigation to land adjacent or in close proximity to Site 1. *Id.* at 21-22. Ultimately, plaintiffs argue that no deference is due to the explanation offered by Luebke. *Id.* at 20-21. Defendant argues the definition supplied in Luebke's testimony is consistent with the statute. Docket 23 at 20. Additionally, defendant asserts that plaintiffs' construction of the "local area" requirement would not meet the regulation's additional constraints. *Id.* at 23.

There are several problems with plaintiffs' arguments. First, while plaintiffs contend that the authors of the NFSAM are entitled to a measure of deference, the portion of the NFSAM cited by plaintiffs merely restates the same regulatory language found in 7 C.F.R. § 12.31(b)(2)(ii). *See* Docket 19 at 21 (citing A.R. 909). Plaintiffs do not explain how the NFSAM's circular reference to the regulation shines any new light on the "local area" requirement. Consequently, even if some level of deference were owed to the authors of the NFSAM, there is nothing for the court to defer to here. Rather, it appears that

Foster Request for Review
001282

the NFSAM simply directs the NRCS to follow the USDA regulation–the very contention the NRCS argues it has done.

Second, in support of what appears to be their own definition, plaintiffs point to two sites on their land that were offered to the agency in 2009 for comparison purposes.[11] Docket 19 at 18. These sites were located within one mile from Site 1 and, according to plaintiffs, would satisfy the "local area" requirement. *Id.* As defendant argues, however, although plaintiffs' comparison sites may literally be more local than the Tetonka site, the USDA regulation also requires the comparison site to be "on the same hydric soil map unit" and "under non-altered hydrologic conditions." Docket 23 at 23 (citing 7 C.F.R § 12.31(b)(2)(ii)). As the hearing officer observed, plaintiffs offered no evidence that these additional requirements were met by their comparison sites. A.R. 236. Further, the agency's soil samples revealed differences in the hydric soil content within a short distance from Site 1, which undermines plaintiffs' argument that proximity alone is sufficient to satisfy the regulation. Moreover, the NRCS explained that

> [A]t the [plaintiffs'] request we conducted a visual assessment of two grassed pasture/hayland fields for potential vegetative reference sites. These fields were cropped, hayed, grazed, and/or sprayed in their recent history. Most of the onsite vegetation was unidentifiable due to disturbance. . . . The Tetonka reference site in Kingsbury County (NW 1/4 S27, T110 R56) was used.

-----

[11] When asked if plaintiffs had offered the NRCS comparison sites, Mrs. Foster replied, "Yes, I did. That was not in this November of 2010 visit. It was in the previous one in 2009." A.R. 186.

Foster Request for Review
001283

A.R. 1021. Thus, the agency determined plaintiffs' reference sites did not meet the regulation's requirements and, as the hearing officer pointed out, plaintiffs have presented no evidence which suggests that determination was wrong. *See id.* at 236. Consequently, plaintiffs' own construction of the "local area" requirement cannot satisfy the regulation's other requirements.[12]

Therefore, the remaining issue is whether deference is owed to the "local area" interpretation offered in Luebke's testimony. The specific regulation at issue provides that the "*NRCS will determine if* a prevalence of hydrophytic vegetation typically exists in the local area . . . ." 7 C.F.R § 12.31(b)(2)(ii) (emphasis added). Thus, the regulation explicitly charges the NRCS with making the "local area" determination as part of its investigation.  To this end, Luebke's testimony purports that "the agency is defining" and "the agency is saying" it interprets the "local area" requirement as encompassing land within an MLRA. *Id.* 151. Typically, as the deputy director observed, an agency's interpretation of its own regulation is entitled to deference. *See* A.R. 297; *Auer,* 519 U.S. at 461. Whether the definition offered by Luebke in fact represents the agency's interpretation, however, is unclear.

---

[12] In addition to the proximity argument, plaintiffs also argue the Tetonka site received "dissimilar precipitation levels" and had a "much deeper depression" than Site 1.  Docket 19 at 18. According to Luebke's unchallenged testimony, however, both sites received an average of 18-25 inches of rain per year and both sites were determined to be similar potholes. A.R. 151-52. Luebke's testimony indicates the agency took this information into account when selecting a reference site. Plaintiffs have not shown, beyond a bare assertion, that the range of rainfall shared by both locations or the differences in the depth of the potholes renders the Tetonka site insufficiently "local."

Foster Request for Review
001284

Nonetheless, plaintiffs had the opportunity to cross-examine Luebke's testimony about the agency's interpretation, but chose not to. Moreover, while Luebke's statement arose during testimony before the hearing officer on October 18, 2011, the NRCS's earlier summary report dated June 15, 2011, also uses the same equivalence between the "local area" and an MLRA. *See* A.R. 346 (explaining the Tetonka site "is located within the same Major Land Resource Area 55C (local area)"). Thus, the definition supplied before the hearing officer was not solely offered as a " 'post hoc rationalization[]' for agency action, advanced for the first time" as a litigation position. *See Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 156 (1991). Additionally, making the "local area" determination–as well as the wetland determination itself–implicates "complex matters within the [agency's] area of expertise[.]" *See Clason*, 438 F.3d at 871. While not controlling, the court concludes that, based on these factors, the interpretation offered by Luebke and accepted by the NAD "give[s] it power to persuade." *See Godinez-Arroyo v. Mukasey*, 540 F.3d 848, 851 (8th Cir. 2008) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Therefore, the court finds the NAD did not act arbitrarily or capriciously by choosing to defer to the interpretation offered by the NRCS. Thus, the court finds the NAD did not act arbitrarily or capriciously by concluding that, because Site 1 was located within the same MLRA as the Tetonka site, the "local area" requirement was satisfied.

In summary, the Tetonka site met each of the USDA regulation's requirements for use as a reference site, and the NRCS could consider the

Foster Request for Review
001285

vegetation on the Tetonka site in order to determine if Site 1 would support a prevalence of hydrophytic vegetation in the absence of human alteration. The deputy director did not act arbitrarily or capriciously by concluding Site 1 met the hydrophytic vegetation criterion following the NRCS's comparison. Additionally, the NRCS did not conflate any of the three wetland criteria by comparing Site 1 to an otherwise proper reference site in order to establish Site 1's hydrophytic vegetation. Thus, the court concludes the NAD has articulated "a 'rational connection between the facts found and the choice made.' " *Bowman*, 419 U.S. at 285 (citation omitted). Therefore, the court finds the deputy director did not act arbitrarily or capriciously by upholding the hearing officer's conclusion that Site 1 met the hydrophytic vegetation criterion.

### C.  **Plaintiffs' Evidence**

Finally, plaintiffs contend the NRCS ignored evidence that would have demonstrated Site 1 was not a wetland. According to plaintiffs, this evidence undermines the findings of the NRCS with respect to the hydrology and hydrophytic vegetation criteria. For example, plaintiffs argue the NRCS refused to consider the effects from snowmelt of a nearby shelterbelt that causes water to drain onto Site 1. Docket 19 at 31. Additionally, plaintiffs contend that the NRCS refused to consider two holes plaintiffs dug which, according to their own observations, revealed an absence of long-term water ponding. *Id.*[13]

---

[13] Plaintiffs also contend that the NRCS refused to consider the two locations on plaintiffs property offered as reference sites. Docket 19 at 31. The NRCS did consider the sites offered by plaintiffs, however, and rejected them because those sites did not meet the USDA regulation's requirements.

Foster Request for Review
001286

First, plaintiffs cite the *B&D Land* decision, noting that the court faulted the NAD for ignoring the credibility of the plaintiff's expert evidence. Docket 19 at 30 (citing *B&D Land*, 584 F. Supp. 2d at 1199.). Plaintiffs, however, have presented no expert testimony or evidence with respect to the agency's wetland determination procedures. Additionally, as the hearing officer explained, plaintiffs themselves possess no expertise in making wetland determinations. A.R. 234. Thus, comparison to the *B&D Land* decision on this point is inapposite.

Second, the administrative record shows that the NRCS did not ignore plaintiffs' findings, but rejected them based on other considerations. With respect to melting snow from the shelterbelt running off into Site 1, Michelle Burke testified that the possibility Site 1 could be an artificial wetland was investigated and dismissed. A.R. 155. According to her testimony, in order for an area to be an artificial wetland, it would first have to be a non-wetland that was transformed over time. *Id.* Regarding the soil samples taken from Site 1 and its surrounding area, the sample taken nearest to the shelterbelt was not hydric, nor was the snow that would collect and melt into water sufficient to create hydric soils. *Id.* at 156. As the hearing officer explained, "[i]f the draining snowmelt was the cause of the hydric soils at Site 1, then the soil between the shelterbelt and Site 1 should also be hydric. However, even the soil next to the shelterbelt is an upland soil and not hydric." *Id.* at 237. Additionally, plaintiffs estimated that the shelterbelt was planted in 1936, Docket 19 at 12, but the NRCS determined the soil profile in Site 1 dated back to glaciation. A.R. 156-

Foster Request for Review
001287

57. Here, too, the hearing officer noted that this "indicates the necessary hydrologic conditions were present long before the shelterbelt existed." *Id.* at 237. Thus, the hearing officer agreed with the NRCS that the shelterbelt was not the only source of water draining into Site 1, that the hydric soils were only found within Site 1, and that the soil profile within Site 1 predated the shelterbelt's existence. *Id.* at 237-38.

With respect to the two holes plaintiffs dug in order to observe water levels, Burke testified that this information was also considered by the NRCS. *Id.* at 157-58. According to her testimony, the test holes near the trees and in the wetlands responded similarly to rainfall. *Id.* at 158. The agency's observations were also noted in the June 15, 2011, summary report. *Id.* at 346 (concluding the data provided by plaintiffs was "Consistent with NRCS findings."). Moreover, as the hearing officer explained,

> [Plaintiffs] [c]ited no regulation or authority for this procedure. [Plaintiffs] stated there were no measuring devices, like a piezometer, used to measure the water entering or leaving the holes. [Plaintiffs] stated that there was no tubing or structure of any kind inside the holes and that it was "just dirt." . . . Therefore, this data is unreliable and not suitable for drawing conclusions about whether Site 1 is a wetland or not.

*Id.* at 234-35. Thus, the hearing officer concluded the NRCS's conclusions were not only supported by expert testimony but also by the proper procedures for making wetland determinations. *Id.*

This court must "accept the agency's factual findings if they are supported by substantial evidence," and " '[s]ubstantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the

Foster Request for Review
001288

[agency's] conclusion.' " *Maverick Transp.*, 739 F.3d at 1153 (citations omitted). The foregoing discussion shows that neither the NRCS nor the NAD ignored plaintiffs' findings. Instead, plaintiffs' findings were considered and, as detailed by the hearing officer, rejected as being inconsistent with wetland determination procedures or otherwise scientifically unreliable. Plaintiffs bore the burden of proving the NRCS's determination was erroneous by a preponderance of the evidence. Throughout the NAD appeal procedure, however, plaintiffs chose to either not challenge NRCS experts regarding their findings and conclusions, and to present only lay evidence that both the NRCS and NAD addressed and rejected. After reviewing the agency record, the court concludes the NAD's factual findings are supported by substantial–and, at times uncontroverted–evidence.

In sum, the NAD considered each of the three wetland criteria, as well as the NRCS procedures required to establish those criteria. Ultimately, the NAD concluded that each of the three criteria had been established, and that plaintiffs had not met their burden of proving the NRCS's determination was erroneous. A.R. 297. The court finds the administrative record supports the NAD's conclusions, and that plaintiffs have not shown the NAD "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Moreover, the court concludes the agency has made a rational connection between the facts

Foster Request for Review
001289

found and the choice made. *Bowman*, 419 U.S. at 285 (citation omitted). Thus, the court finds that plaintiffs have not shown the NAD acted arbitrarily or capriciously. Summary judgment in favor of the defendant is granted.

## CONCLUSION

Plaintiffs have failed to show that the NAD acted arbitrarily or capriciously with respect to its conclusions that the NRCS properly followed its wetland determination procedures, that Site 1 was a wetland, and that plaintiffs failed to meet their burden of proving the NRCS's determination was erroneous. Accordingly, it is

ORDERED that the motion for summary judgment by defendant (Docket 22) is granted.

IT IS FURTHER ORDERED that the motion for summary judgment by plaintiffs (Docket 26) is denied.

Dated October 31, 2014.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

Foster Request for Review
001290

Case 4:21-cv-04081-RAL   Document 32-1   Filed 11/16/21   Page 72 of 84 PageID #:
1498
Case 4:13-cv-04060-KES   Document 28-1   Filed 10/31/14   Page 1 of 2 PageID #: 8

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| ARLEN FOSTER and CINDY FOSTER | CIV. 13-4060-KES |
| Plaintiffs, | JUDGMENT |
| vs. | |
| TOM VILSACK, Secretary, United States Department of Agriculture, | |
| Defendant. | |

Pursuant to the Memorandum Opinion and Order Granting Defendant's Motion for Summary Judgment and Denying Plaintiffs' Motion for Summary Judgment, it is

ORDERED, ADJUDGED, AND DECREED that judgment is entered in favor of defendant, Tom Vilsack, Secretary of Agriculture, United States Department of Agriculture, and against plaintiffs, Arlen and Cindy Foster.

Dated October 31, 2014.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

Foster Request for Review
001291

# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-3887

_____

Arlen Foster; Cindy Foster

*Plaintiffs - Appellants*

v.

Tom Vilsack, Secretary, United States Department of Agriculture

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: November 18, 2015
Filed: April 11, 2016

_____

Before SMITH, BYE, and BENTON, Circuit Judges.

_____

BYE, Circuit Judge.

Arlen and Cindy Foster brought this action to challenge the United States Department of Agriculture's (USDA's) determination that a portion of the Fosters' farmland is a wetland within the meaning of the pertinent federal statutes and

regulations. The district court[1] granted summary judgment in favor of the USDA after concluding the agency's final decision was not arbitrary, capricious, or contrary to the law. We affirm.

I

Arlen and Cindy Foster own and farm land in Miner County, South Dakota. Miner County is located within what is generally referred to as the Prairie Pothole Region covering some of South Dakota, North Dakota, Minnesota, and parts of three Canadian provinces. The USDA uses its own nomenclature to describe various land areas within the United States; under that nomenclature larger Land Resource Regions (LRRs) are subdivided into Major Land Resource Areas (MLRAs). The Fosters' farm is located within LRR F, or the Northern Great Plains Spring Wheat Region, and more specifically within an MLRA called the Southern Black Glaciated Plains. For purposes of this appeal, the MLRA where the Fosters' farm is located is relevant for determining the types of soils found within the MLRA, which in turn is relevant for determining what types of vegetation would exist when a particular soil is in its natural state, including vegetation which would naturally be found in a wetland.

In 1985, Congress passed the Food Security Act of 1985 which contains "Swampbuster provisions authoriz[ing] the USDA to make determinations as to whether certain lands qualify as wetlands and whether wetlands that have been manipulated qualify as converted wetlands." Clark v. United States Dept. of Agric., 537 F.3d 934, 935 (8th Cir. 2008). Swampbuster was passed "[i]n order to combat the disappearance of wetlands through their conversion into crop lands[.]" Gunn v. United States Dep't of Agric., 118 F.3d 1233, 1235 (8th Cir. 1995). Significantly,

---

[1]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

-2-

"a person determined to have converted wetlands may become ineligible to receive farm program payments" from the federal government. <u>Clark</u>, 537 F.3d at 935.

This appeal concerns a wetland determination made by the USDA affecting just under an acre (0.8 acres) of the Fosters' farm, a prairie pothole[2] which the parties call Site 1.  On June 3, 2002, Arlen Foster initially sought a wetlands determination from the Natural Resource Conservation Service (NRCS), an agency within the USDA, for a larger tract of land which included Site 1.  After a number of intermittent agency proceedings not relevant to this appeal, the NRCS ultimately certified Site 1 as a wetland on June 23, 2011.  The Fosters appealed the June 2011 determination to the USDA National Appeals Division (NAD), a separate agency within the USDA established to address certain claims and disputes, including wetland determinations.

In the first step of the NAD appeal, the Fosters bore the burden of proving the NRCS's determination "was erroneous by a preponderance of the evidence." 7 C.F.R. § 11.8(e).  Both the Fosters and the NRCS were permitted to present evidence and conduct cross-examination at a hearing held in October 2011.  On January 10, 2012, the NAD hearing officer issued a detailed fourteen-page decision determining the NRCS followed the proper procedures and had appropriately found that Site 1 was a wetland, and that the Fosters had not met their burden of proving the NRCS's determination was erroneous.  Appellant's App. at 4-17.

In the second step of the NAD appeal, the Fosters sought review of the hearing officer's decision by the NAD director's office pursuant to 7 C.F.R. § 11.9.  On July 16, 2012, the NAD director's office issued a decision upholding the hearing officer's

---

[2]A prairie pothole is simply a small, shallow depression found in glaciated portions of the United States which frequently has standing water for parts or all of a growing season in years where the precipitation is normal or above average.

-3-

decision, which in relevant part held the NRCS proved the presence of the three controlling criteria for a wetland determination by showing that Site 1:

> (a) had a predominance of hydric soils, (b) was inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions, and (c) under normal circumstances would support a prevalence of hydrophytic vegetation.

Appellant's App. at 33; see also 16 U.S.C. § 3801(a)(27); 7 C.F.R. § 12.2 (setting forth the three criteria used to determine whether a specific area of land qualifies as a wetland under federal law). The NAD director's office also held the Fosters "did not prove by a preponderance of the evidence that the [NRCS] decision was erroneous." Appellant's App. at 34. The decision from the NAD director's office constituted the USDA's final agency decision on the matter.

In May 2013, the Fosters filed a complaint in federal district court seeking judicial review of the USDA's final agency decision. Both parties filed motions for summary judgment. In the summary judgment proceedings, the Fosters did not dispute that Site 1 contains a predominance of hydric soils[3] (the first of the three relevant criteria), but challenged the final agency decision with regard to whether Site 1 had the requisite hydrology[4] to qualify as a wetland and whether its soil would

---

[3] A hydric soil is a soil that is "formed under conditions of saturation, flooding, or ponding long enough during the growing season to develop anaerobic conditions in the upper part. This definition includes soils that developed under anaerobic conditions in the upper part but no longer experience these conditions due to hydrologic alteration such as those hydric soils that have been artificially drained or protected (e.g., ditches or levees)." Changes in Hydric Soils Database Selection Criteria, 77 Fed. Reg. 12234-01, 12234-35 (Feb. 29, 2012).

[4] Hydrology refers to the degree of flooding or soil saturation present on the land.

-4-

support a prevalence of hydrophytic vegetation[5] under normal circumstances (the last two of the three relevant criteria).

The district court granted USDA's motion for summary judgment and denied the Fosters' motion for summary judgment. The district court concluded the NAD's factual findings were supported by substantial (at times, uncontroverted) evidence and the record supported the NAD's legal conclusions. The district court therefore determined the Fosters had failed to show the USDA's final agency decision was arbitrary, capricious, or contrary to the law. This timely appeal followed.

II

We review the district court's grant of summary judgment de novo. Doud v. Toy Box Dev. Co., 798 F.3d 709, 712 (8th Cir. 2015). The issue before the district court was whether the USDA's final agency decision was proper under the Administrative Procedures Act (APA), 5 U.S.C. § 706. Under the APA, judicial review of an agency decision is limited to determining whether the agency action is "arbitrary, capricious, [] an abuse of discretion, or otherwise not in accordance with law." Id. § 706(2)(A). If the agency's decision is supportable on any rational basis, the court must uphold it. Voyageurs Nat'l Park Ass'n v. Norton, 381 F.3d 759, 763 (8th Cir. 2004).

A

The Fosters first contend the USDA erred in determining Site 1 had the requisite hydrology to qualify as a wetland. More specifically, the Fosters challenge

---

[5]Hydrophytic vegetation means "a plant growing in . . . water . . . or . . . a substrate that is at least periodically deficient in oxygen during a growing season as a result of excessive water content." 16 U.S.C. § 3801(a)(13); see also 7 C.F.R. § 12.31(b). Examples of hydrophytic vegetation are cattails and rushes.

Foster Request for Review 001296

Appellate Case: 14-3887    Page: 5    Date Filed: 04/11/2016 Entry ID: 4386988

the methodology the NRCS used to determine the presence of wetland hydrology at Site 1's pothole. In this case, the methodology used by the NRCS included viewing aerial photographs of the pothole when it was under normal environmental conditions. The NRCS chose to view aerial photographs because Site 1 was drier than it would have been under normal conditions at the time of the agency's on-site visit in November 2010, and the Fosters had tilled the pothole so it was not in its natural condition.

Although the Fosters generally acknowledge the legitimacy of using aerial photographs to determine whether a site has the requisite hydrology to qualify as a wetland, they contend the NRCS improperly relied upon "color tone" differences in the aerial photographs as an authorized "signature" of a wetland. The Fosters argue that relying on color tone differences as a signature of hydrology is contrary to the prescribed methodology used to make a wetland determination.

The parties agree there are ten recognized signatures the NRCS may rely upon when using aerial photographs to determine a site's hydrology, which are set forth in the South Dakota Mapping Conventions. The ten wetland (or wetness) signatures are listed on a form labeled SD-LTP-33 (Form 33) and are as follows: (1) hydrophytic vegetation; (2) surface water; (3) saturated conditions; (4) stressed crops due to wetness; (5) differences in vegetation due to different planting dates; (7) inclusion of wet areas as set-aside or idled; (8) circular or irregular areas of unharvested crops within a harvested field; (9) isolated areas that are not farmed with the rest of the field; and (10) areas of greener vegetation (especially during dry years). Admin. Record at 451. The parties also agree that if any of these signatures appear in over half of the normal rainfall year photographs, the presence of wetland hydrology is established.

In this case, Michelle Burke, an agricultural engineer employed by the NRCS, testified at the October 2011 hearing that she identified some of these signatures at

-6-

the site of the pothole in seven out of ten years in which the area had normal rainfall. The Fosters did not cross-examine Burke on this testimony. Instead, the Fosters rely upon a form Burke completed to document the presence of wetlands called Form 28. Instead of using the ten authorized signatures identified in Form 33, Form 28 lists four shorthand abbreviations for those ten signatures, one of which is "CT" for "color tone" differences. When filling out Form 28, Burke used this abbreviated shorthand to document the signatures she identified on the aerial photographs of the Fosters' pothole.

The Fosters contend that checking CT on Form 28 amounts to an improper consideration of "color tone" to identify a wetland, even though "color tone" is not an authorized wetland signature. As the district court noted, however, CT is nothing more than an abbreviation used on one of the agency's forms. Burke's unchallenged testimony established that she actually identified some of the ten authorized signatures at Site 1 in the requisite number of normal rainfall years. She did not testify that she merely saw changes in "color tone" in the aerial photographs. Burke's testimony was therefore sufficient to support the agency's final decision, and the Fosters' contention is merely an attack upon an alleged deficiency in an agency form.

B

The Fosters next contend the USDA improperly determined that Site 1 would support a prevalence of hydrophytic vegetation under normal circumstances. More specifically, the Fosters claim the USDA improperly used a comparison site too far away from their farm to make its determination, that is, the agency's comparison site was outside the "local area" required by the governing regulation.

When "the vegetation on [a disputed site] has been altered or removed," as was the case here because the Fosters had tilled the pothole located at Site 1, the pertinent federal regulation authorizes the NRCS to "determine if a prevalence of hydrophytic

-7-

vegetation exists in the *local area* on the same hydric soil map unit under non-altered hydrologic conditions." 7 C.F.R. § 12.31(b)(2)(ii) (emphasis added). In other words, when a disputed site is not in its natural vegetative state, the NRCS must use a comparison site in the local area which contains the same soil type as the disputed site to determine what vegetation would typically be found if the disputed site had not been altered.

In this case, the NRCS verified that Site 1 was located in a Tetonka hydric soil map unit (one of approximately twenty soil series identified by the USDA within the Southern Black Glaciated Plains MLRA), and the Fosters do not dispute that fact. The NRCS next chose an unaltered comparison site within the same Tetonka hydric soil map unit, a site located about forty miles away from Site 1 in Kingsbury County, South Dakota. The NRCS chose the Kingsbury County site for a number of other reasons, such as its inclusion on an approved list of sites established as comparison sites due to their undisturbed nature, and the fact that it was a prairie pothole similar to Site 1. In choosing the Kingsbury County site, the NRCS considered but rejected two closer alternative sites proposed by the Fosters on their own farm land (described as two grassed pasture/hayland fields that had recently been cropped, hayed, grazed and/or sprayed) neither of which were ever established by the Fosters as meeting the required regulatory criteria (i.e., located on the same hydric soil map unit as Site 1, or undisturbed and thus under non-altered hydrologic conditions).

Despite their failure to establish that their alternative sites satisfied the regulatory criteria, the Fosters contend the NRCS improperly chose its comparison site because their proposed sites were within the "local area" while the Kingsbury County site was not. We reject this contention, which is unsupported by any authority. The unchallenged testimony of Kevin Luebke, an NRCS biologist who testified at the October 2011 hearing, established that the USDA interpreted the "local area" referenced in § 12.31 to mean the same MLRA as the disputed site. Like Site 1, the Kingsbury County comparison site is also located within the Southern Black

-8-

Foster Request for Review 001299

Glaciated Plains MLRA, and thus meets the regulatory criteria under the agency's reasonable interpretation, to which we owe deference.  See Friends of Boundary Waters Wilderness v. Dombeck, 164 F.3d 1115, 1128 (8th Cir. 1999) (requiring deference "to the informed discretion of the responsible federal agencies" when an analysis of the relevant information requires a high level of expertise); see also Downer v. United States, 97 F.3d 999, 1003-04 (8th Cir. 1996), affirming Downer v. United States, 894 F. Supp. 1348, 1354, 1354 n.7 (D.S.D. 1995) (upholding the USDA's use of a comparison site which satisfied the regulatory criteria set forth in § 12.31 despite the landowner's complaint that the site was too far away (thirty miles) to be considered).  We therefore conclude the agency's use of the Kingsbury County site as a comparison site was not arbitrary, capricious, or contrary to the law.

III

We affirm the district court.

_____

Foster Request for Review 001300

**United States Court of Appeals**
*For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
**St. Louis, Missouri 63102**

**Michael E. Gans**
*Clerk of Court*

VOICE (314) 244-2400
FAX (314) 244-2780
www.ca8.uscourts.gov

April 11, 2016

Mr. Thomas A. Lawler
LAWLER & SWANSON
P.O Box 280
601 Coates Street
Parkersburg, IA  50665-0000

    RE:  14-3887  Arlen Foster, et al v. Tom Vilsack

Dear Counsel:

    The court today issued an opinion in this case. Judgment in accordance with the opinion was also entered today. The opinion will be released to the public at 10:00 a.m. today. Please hold the opinion in confidence until that time.

    Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules. Note particularly that petitions for rehearing and petitions for rehearing en banc <u>must</u> be received in the clerk's office within 45 days of the date of the entry of judgment. Counsel-filed petitions must be filed electronically in CM/ECF. Paper copies are not required. No grace period for mailing is allowed, and the date of the postmark is irrelevant, for pro-se-filed petitions. Any petition for rehearing or petition for rehearing en banc which is not received within the 45 day period for filing permitted by FRAP 40 may be denied as untimely.

    Michael E. Gans
    Clerk of Court

AMT

Enclosure(s)

cc:   Ms. Cheryl Schrempp DuPris
      Mr. Joseph A. Haas
      Mr. John S. Theeler

    District Court/Agency Case Number(s):  4:13-cv-04060-KES

Foster Request for Review
001301

**United States Court of Appeals**
*For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
**St. Louis, Missouri 63102**

Michael E. Gans
*Clerk of Court*

VOICE (314) 244-2400
FAX (314) 244-2780
www.ca8.uscourts.gov

April 11, 2016

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

RE:  14-3887  Arlen Foster, et al v. Tom Vilsack

Dear Sirs:

An opinion was filed today in the above case.

Counsel who represented the appellant was Thomas A. Lawler of Parkersburg, IA.

Counsel who represented the appellee was Cheryl Schrempp DuPris, AUSA, of Pierre, SD.

The judge who heard the case in the district court was Honorable Karen E. Schreier. The judgment of the district court was entered on October 31, 2014.

If you have any questions concerning this case, please call this office.

Michael E. Gans
Clerk of Court

AMT

Enclosure(s)

cc:  Lois Law
     MO Lawyers Weekly

District Court/Agency Case Number(s):  4:13-cv-04060-KES

Foster Request for Review
001302

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

_____

No:  14-3887

_____

Arlen Foster; Cindy Foster

Plaintiffs - Appellants

v.

Tom Vilsack, Secretary, United States Department of Agriculture

Defendant - Appellee

_____

Appeal from U.S. District Court for the District of South Dakota - Sioux Falls
(4:13-cv-04060-KES)

_____

## JUDGMENT

Before SMITH, BYE and BENTON, Circuit Judges.


This appeal from the United States District Court was submitted on the record of the

district court and briefs of the parties.

After consideration, it is hereby ordered and adjudged that the judgment of the district

court in this cause is affirmed in accordance with the opinion of this Court.

April 11, 2016

Order Entered in Accordance with Opinion:
Clerk, U.S. Court of Appeals, Eighth Circuit.
_____

        /s/ Michael E. Gans